Joel E. Elkins (SBN 256020)
**WEISSLAW LLP**
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone:   (310) 208-2800
Facsimile:    (310) 209-2348
Email: jelkins@weisslawllp.com

Robert V. Prongay (SBN 270796)
Pavithra Rajesh (SBN 323055)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:     (310) 201-9150
Facsimile:      (310) 201-9160
Email: rprongay@glancylaw.com
Email: prajesh@glancylaw.om

*Co-Lead Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE VMWARE, INC. STOCKHOLDER DERIVATIVE LITIGATION | Case No. 5:20-CV-03079-EJD |
| | **VERIFIED CONSOLIDATED AND AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** |

# TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE ACTION ................................................... 1

II.     JURISDICTION AND VENUE ........................................................................... 2

III.    PARTIES ............................................................................................................. 3

IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS .......................................... 5

        A.      Fiduciary Duties ................................................................................ 5

        B.      Business Conduct Guidelines ............................................................ 6

        C.      Audit Committee Charter .................................................................. 6

        D.      Compensation and Corporate Governance ("CCG") Committee Charter ................ 7

V.      SUBSTANTIVE ALLEGATIONS ................................................................... 7

        A.      Background ........................................................................................ 7

                1.      Dell's Controlling Interest in VMware ....................................... 8

                2.      VMware's Reporting of Backlog ................................................ 10

                3.      Rules Relevant to the Recognition of Revenue and Reporting of Backlog 11

                4.      The SEC's Vigorous Enforcement of Policies Prohibiting Improper Earnings Management ........................................................... 14

        B.      The Individual Defendants' Improper Earnings Management ............................... 18

                1.      VMware's Second Quarter of its 2019 Fiscal Year ..................... 18

                2.      VMware's Third Quarter of its 2019 Fiscal Year ....................... 20

                3.      VMware's Fourth Quarter and Full Year Fiscal 2019 ................. 22

                4.      VMware's False and Misleading Proxy Statement ..................... 24

                5.      VMware's First Quarter of its 2020 Fiscal Year ........................ 27

                6.      VMware's Second Quarter of its 2020 Fiscal Year ..................... 31

                7.      VMware's Third Quarter of its 2020 Fiscal Year ....................... 34

8.     VMware Discloses that the SEC is Investigating its Reported Backlog..... 38

C.     Defendants Gelsinger and Rowe Sold Over $41 Million in VMware Stock While in Possession of Material Adverse Non-Public Information ........................................ 39

1.     Defendant Gelsinger's Insider Stock Sales ................................................. 39

2.     Defendant Rowe's Insider Stock Sales ....................................................... 41

VI.     DAMAGES TO THE COMPANY ........................................................................................ 42

VII.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ........................................ 43

A.     Defendants Michael Dell and Durban Dominate and Control the Board and VMware.................................................................................................................................. 43

B.     Michael Dell and Silver Lake Fill the VMware Board with Directors Loyal to Them...................................................................................................................................... 44

C.     Michael Dell and Silver Lake Benefitted From the Misclassification VMware's Backlog................................................................................................................................. 46

D.     Demand is Futile as to Count I............................................................................... 49

E.     Demand is Futile as to Count II .............................................................................. 54

F.     Demand is Futile as to Count III ............................................................................. 56

G.     Demand is Futile as to Count IV ............................................................................. 58

H.     Demand is Futile as to Count V .............................................................................. 59

I.     Demand is Futile as to Count VI ............................................................................. 59

J.     Demand is Futile as to Count VII............................................................................ 60

JURY DEMAND ......................................................................................................................... 68

Plaintiffs the Booth Family Trust, Hugues Gervat, and Stacie Williams (collectively, "Plaintiffs"), by and through Plaintiffs' Co-Lead Counsel, bring this derivative complaint for the benefit of nominal defendant, VMware, Inc. ("VMware" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its officers to remedy breaches of fiduciary duty by the Individual Defendants, insider trading (*i.e.*, *Brophy* claim), violations of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and unjust enrichment. Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of filings by VMware with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, transcripts of conference calls with financial analysts, publicly available filings in lawsuits, and matters of public record.

# I.    NATURE AND SUMMARY OF THE ACTION

1.    VMware is a software company that works with customers in the area of hybrid and multi-cloud, modern applications, networking, security and digital workspaces.

2.    Between March 2019 and February 2020, the Company issued press releases and financial reports disclosing its quarterly backlog and representing that its backlog was "comprised of unfulfilled purchase orders or unfulfilled executed agreements at the end of a given period and is net of related estimated rebates and marketing development funds."

3.    On February 27, 2020, VMware disclosed that, in December 2019, the SEC had "requested documents and information related to VMware's backlog and associated accounting and disclosures." The Company stated that it was "fully cooperating with the SEC's investigation" but is "unable to predict the outcome of this matter at this time."

4.    On this news, VMware's stock price fell $15.11 per share, or 11.14%, to close at $120.52 per share on February 28, 2020, on unusually heavy trading volume.

5.    Moreover, while the material information regarding its backlog remained non-public, VMware spent an aggregate $1.33 billion to repurchase approximately 7.66 million shares of its own common stock at artificially inflated prices. As the Company's stock was actually

worth only $120.52 per share, the price at the close of market on February 28, 2020, the Company overpaid for the repurchases of its own stock by $410 million.

6.    These revelations precipitated the filing of a securities class action in this District against VMware and certain of defendants, captioned *Lamartina v. VMware, Inc., et al.*, Case No. 5:20-cv-02182-EJD (the "Securities Class Action").

7.    Plaintiffs did not make and are excused from making a litigation demand prior to filing this action because such demand would be futile based upon both the composition of the Board and the actions taken by the Board.  The Board is composed of nine members, all of whom are named in this action.  Defendants Michael Dell and Durban together dominate and control VMware's Board.  No director is independent of them, and no director would vote to institute suit against any of VMware's corporate fiduciaries because doing so would harm the financial interests of Michael Dell and Durban.  Further, as alleged herein, Gelsinger, as Chief Executive Officer ("CEO"), and Michael Brown, Carty, Dykstra, and Sagan, as members of the Audit Committee, actually knew or recklessly disregarded that the Company's representations about its backlog were incomplete or inaccurate at the time they were disseminated, yet they allowed these misleading statements to be disseminated and never timely sought to correct those disclosures.  Moreover, Patrick Gelsinger, the Company's CEO, sold over $23 million in VMware stock while in possession of material non-public information regarding VMware's true financial condition and business prospects.  Thus, more than half the members of the Board are conflicted from exercising the necessary independence and disinterest in response to a shareholder demand to investigate their own wrongdoing.

## II.    JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 10(b) of the Securities Exchange Act of 1934.

9.    This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

10.    This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

### Plaintiffs

12.    Plaintiff the Booth Family Trust ("Booth") is a current shareholder of VMware. Booth has continuously held VMware Class A common stock since November 5, 2010.

13.    Plaintiff Hugues Gervat is a current shareholder of VMware.  Gervat has continuously held VMware Class A common stock since he purchased it and was a shareholder at the time of the transactions complained of or before the disclosure the wrongdoing alleged herein.

14.    Plaintiff Stacie Williams is a current shareholder of VMware.  Williams has continuously held VMware Class A common stock since 2018.

### Nominal Defendant

15.    Nominal Defendant VMware is incorporated under the laws of Delaware with its principal offices located at 3401 Hillview Avenue, Palo Alto, California 94304.  The Company's stock trades on the New York Stock Exchange ("NYSE") under the symbol "VMW."

### Defendants

16.    Defendant Patrick P. Gelsinger ("Gelsinger") has served as CEO and a director of the Company since September 2012.  Gelsinger is named as a defendant in the Securities Class Action.  Gelsinger is a resident of California.

17.    Defendant Zane Rowe ("Rowe") has served as Chief Financial Officer ("CFO") and Executive Vice President of the Company since March 2016.  Rowe is named as a defendant in the Securities Class Action.  Rowe is a resident of California.

18.    Defendant Michael Dell has served as Chairman of the Board of Directors of the Company since September 2016 when Dell Technologies Inc. ("Dell") acquired EMC Corporation

("EMC"), VMware's parent company.  Michael Dell is the CEO, Chairman of the Board of Directors, and a majority stockholder of Dell, which controls approximately 80.9% of VMware's outstanding common stock (including 31 million shares of VMware's Class A and all of its Class B common stock) and controls the election of each of VMware's 9 directors.  Thus, VMware is a "controlled company" under the rules of the NYSE.  According to the Company's public filings, Michael Dell is not an independent director of VMware.  Michael Dell is a resident of Texas.

19.    Defendant Anthony Bates ("Bates") has served as a director of the Company since February 2016.  He is a member of the Compensation and Corporate Governance Committee. Bates is a resident of California.

20.    Defendant Marianne Brown has served as a director of the Company since October 16, 2019. Since her appointment to the Board, she has served on the Audit Committee.  Marianne Brown is a resident of New York.

21.    Defendant Michael Brown has served as a director of the Company since April 2007. He is Chair of the Audit Committee and a member of the Compensation and Corporate Governance Committee. Michael Brown is a resident of Washington.

22.    Defendant Donald Carty ("Carty") has served as a director of the Company since December 2015.  He is a member of the Audit Committee.  Carty is a resident of Texas.

23.    Defendant Egon Durban ("Durban") has served as a director of the Company since September 2016 when Dell acquired EMC.  He is also a director of Dell.  According to the Company's public filings, Durban is not an independent director of VMware.  Durban is a resident of California.

24.    Defendant Karen Dykstra ("Dykstra") has served as a director of the Company since March 2016.  She is a member of the Audit Committee.  Dykstra is a resident of New Jersey.

25.    Defendant Paul Sagan ("Sagan") has served as a director of the Company since April 2014.  He is a member of the Audit Committee.  Sagan is a resident of Massachusetts.

26.    The defendants named in ¶¶ 16-25 are sometimes referred to hereinafter as the "Individual Defendants."

1    **IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS**

2         **A.     Fiduciary Duties**

3         27.     By reason of their positions as officers, directors, and/or fiduciaries of VMware and

4    because of their ability to control the business and corporate affairs of VMware, at all relevant

5    times, the Individual Defendants owed VMware and its shareholders fiduciary obligations of good

6    faith, loyalty, and candor, and were required to use their utmost ability to control and manage

7    VMware in a fair, just, honest, and equitable manner.  The Individual Defendants were required to

8    act in furtherance of the best interests of VMware and its shareholders so as to benefit all

9    shareholders equally and not in furtherance of their personal interest or benefit.  Each director and

10   officer of the Company owes to VMware and its shareholders a fiduciary duty to exercise good

11   faith and diligence in the administration of the affairs of the Company and in the use and

12   preservation of its property and assets, and the highest obligations of fair dealing.

13        28.     The Individual Defendants, because of their positions of control and authority as

14   directors and/or officers of VMware, were able to and did, directly and/or indirectly, exercise

15   control over the wrongful acts complained of herein.  Because of their advisory, executive,

16   managerial, and directorial positions with VMware, each of the Individual Defendants had

17   knowledge of material non-public information regarding the Company.

18        29.     To discharge their duties, the officers and directors of VMware were required to

19   exercise reasonable and prudent supervision over the management, policies, practices and controls

20   of the Company.  By virtue of such duties, the officers and directors of VMware were required to,

21   among other things:

22                    (a)     Exercise good faith to ensure that the affairs of the Company were

23                            conducted in an efficient, business-like manner so as to make it possible to

24                            provide the highest quality performance of their business;

25                    (b)     Exercise good faith to ensure that the Company was operated in a diligent,

26                            honest, and prudent manner and complied with all applicable federal and

27                            state laws, rules, regulations and requirements, and all contractual

28                            obligations, including acting only within the scope of its legal authority;

(c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.    Business Conduct Guidelines**

30.    The Company's Business Conduct Guidelines "outline[s] the standards of behavior expected of each" of VMware's employees.  In relevant part, the Business Conduct Guidelines require that "VMware books and records . . . reflect all transactions included in its results of operations and financial position truthfully, accurately, and in compliance with generally accepted accounting principles."

31.    Moreover, according to the Conduct Guidelines:

E.    ENSURE    FULL,    FAIR,    ACCURATE,    TIMELY,    AND UNDERSTANDABLE DISCLOSURE AND FINANCIAL REPORTING As a public company, VMware is required to file periodic and other reports and documents with the U.S. Securities and Exchange Commission ("SEC") and to make other public communications.  VMware must provide accurate, complete, and timely disclosure in those SEC reports and documents and in its other public communications, including disclosure of VMware financial results and financial condition.  Accordingly, we must fully meet our responsibilities to ensure that VMware financial reports and records are in strict compliance with all applicable laws, generally accepted accounting principles, and VMware policies.  We must provide information that is accurate, complete, objective, relevant, timely, and understandable; act in good faith, responsibly, with due care, competence, and diligence, without misrepresenting or omitting material facts or allowing our independent judgment to be subordinated; and impose and maintain appropriate controls over all assets and resources employed.  VMware people must fully support the audit process and not take any action to improperly influence any public accountant performing an audit or review of VMware financial statements. These responsibilities apply to each of us, but are especially important if you are a member of the VMware Finance Department or are otherwise involved with VMware financial reporting.

**C.    Audit Committee Charter**

32.    The Company's Audit Committee Charter provides that the Audit Committee shall oversee: "(1) the integrity of the Company's financial statements, (2) the Company's compliance with legal, ethical and regulatory requirements; (3) the qualifications and independence of the

Company's registered public accounting firm . . . , (4) the performance of the Company's internal audit function and independent auditor, and (5) the Company's processes to manage enterprise, cybersecurity, compliance and financial risk."

        **D.**     **Compensation and Corporate Governance ("CCG") Committee Charter**

33.     The Company's CCG Committee Charter mandates that its members shall: (1) evaluate and set compensation for the President and Chief Executive Officer (the "CEO") and the other executive officers, (2) monitor the Company's compensation strategy, (3) oversee and advise the Board with respect to corporate governance matters, (4) make recommendations to the Board with respect to assignments to committees of the Board, (5) recommend compensation for non-employee directors, and (6) oversee the evaluation of the Board."

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

34.     VMware is a software and technology firm that helps customers manage their IT resources across private clouds and complex multi-cloud, multi-device environments. VMware solutions enable businesses to more efficiently use existing hardware capabilities by allowing network components, such as servers, to run multiple operating systems or host multiple dedicated applications simultaneously. VMware operates in three market segments: Americas (Latin America, United States, and Canada); Asia Pacific & Japan; and Europe Middle East and Africa.

35.     VMware derives revenue primarily from licensing software under perpetual licenses or consumption-based contracts and the related service revenue, which is comprised of software maintenance and support, training, consulting services and hosted services. License revenue is generated by the Company from selling license software through distributors, resellers, system vendors, system integrators and its direct sales force. VMware's subscription and SaaS[1] revenue consists of hosted services, license usage fees, and perpetual or subscription license sales of its software platform. According to the Company's Annual Report on Form 10-K filed with the

---

[1] Software as a Service, or SaaS, is a method of software delivery and licensing in which software is accessed online via a subscription, rather than bought and installed on individual computers.

SEC on March 26, 2020 (the "2020 10-K"), "[l]icense revenue relating to the sale of perpetual licenses that are part of a multi-year contract is generally recognized upon delivery of the underlying license, whereas revenue derived from our subscription and SaaS offerings is recognized on a consumption basis or over a period of time." Subscription and SaaS revenue is thus recognized more slowly than license revenue.

36.    VMware experienced a customer trend away from license products towards subscription and SaaS products, which results in a longer time frame before revenue may be recognized from deals with customers.

### 1.    Dell's Controlling Interest in VMware

37.    VMware was incorporated under the laws of the State of Delaware in 1998. In January 2004, VMware was acquired by EMC Corporation ("EMC"). An initial public offering of VMware's Class A common stock was conducted in August 2007. Effective September 7, 2016, Dell acquired EMC. As a result, EMC became a wholly-owned subsidiary of Dell, and VMware became an indirectly-held, majority-owned subsidiary of Dell. In a press release issued on September 7, 2016 regarding the acquisition, Michael Dell, Chairman and CEO of Dell, was quoted lauding the acquisition: "We are at the dawn of the next industrial revolution."

38.    A September 7, 2016 VMware press release announces the election of Michael Dell to VMware's Board of Directors as its Chairman, as well as the election of Defendant Durban to the Board of Directors. VMware stated that "[b]oth of these appointments were triggered by Dell Technologies' completion of the acquisition of EMC Corporation, announced today, creating a unique family of businesses that provides the essential infrastructure for organizations to build their digital future, transform IT and protect their most important asset, information."

39.    In VMware's 2020 10-K, it is conceded that the Company is a "controlled company" under the rules of the New York Stock Exchange, where its common stock is listed:

> As of January 31, 2020, Dell beneficially owned 30,678,605 shares of our Class A common stock and all 307,221,836 shares of our Class B common stock, representing 80.9% of the total outstanding shares of common stock or 97.5% of the voting power of outstanding common stock held by EMC, and we are considered a "controlled" company under the rules of the NYSE. Accordingly, strategic and business decisions made by Dell can impact our strategic and business decisions and relationships, and public speculation regarding Dell's strategic

direction and prospects, as well as our relationship with Dell, can cause our stock price to fluctuate.

40.     The 2020 10-K further discloses that Dell, through its control of the Company's Class B common stock, which is generally entitled to 10 votes per share, controls the vote to elect all of VMware's directors and to approve or disapprove all other matters submitted to a stockholder vote.

41.     The VMware Board includes several current and former officers and directors of Dell, including:  Defendant Michael Dell, the Chairman and CEO of Dell; Defendant Carty, the Vice Chairman and Chief Financial Officer of Dell from January 2007 to June 2008; and Defendant Durban, a member of Dell's Board of Directors since October 2013.

42.     In the 2020 10-K it is represented that certain of VMware's directors have potential conflicts of interest with Dell, the Company's controlling shareholder:

> The Chairman of our Board of Directors, Michael Dell, is also Chairman and CEO of Dell and is a significant stockholder of Dell, and one of our directors, Egon Durbin, is member of the Dell board of directors and managing partner of Silver Lake Partners, which is a significant stockholder of Dell.  Another of our directors also holds shares of Dell common stock. Dell, through its controlling voting interest in our outstanding common stock, is entitled to elect 7 of our 8 directors and possesses sufficient voting control to elect the remaining director.  Ownership of Dell common stock by our directors and the presence of executive officers or directors of Dell on our board of directors could create, or appear to create, conflicts of interest with respect to matters involving both us and Dell that could have different implications for Dell than they do for us.  Our Board has approved resolutions that address corporate opportunities that are presented to our directors that are also directors or officers of Dell. These provisions may not adequately address potential conflicts of interest or ensure that potential conflicts of interest will be resolved in our favor.  As a result, we may not be able to take advantage of corporate opportunities presented to individuals who are directors of both us and Dell and we may be precluded from pursuing certain growth initiatives.

43.     On July 15, 2020, Dell issued a press release disclosing that it was considering a spin-off of its stake in VMware.  On September 11, 2020, CRN, a news service, published an article based upon its interview of Michael Dell regarding the potential spin-off.  CRN reported that the proposal is for Dell to spin-off its stake in VMware to Dell and VMware shareholders in order to boost its credit rating, help Dell quickly achieve an investment grade rating, attract new investors, and potentially lower its $48 billion in long-term debt stemming from the EMC purchase.  Thus, if the spin-off is approved, VMware will pay a special dividend to shareholders,

the largest of which are Michael Dell, who owns approximately 52% of Dell, and his private equity partner, Silver Lake, which owns approximately 14% of Dell.

## 2.    VMware's Reporting of Backlog

44.    Backlog is a key performance indicator for the Company's existing product demand and expected future cash flows and revenue. Healthy backlog signals to investors that the Company is experiencing robust demand, as it is a measure of the Company's existing deal pipeline and quantifies the amount of product ordered by VMware's customers, but not yet delivered as of quarter end. Carrying a substantial backlog from one quarter into the next gives the Company a "head start" to meeting revenue and earnings targets for the subsequent financial reporting period.

45.    Because stocks are valued, in large part, based upon future cash flows and growth potential as opposed to revenues and earnings reported in prior periods, carrying a substantial backlog into the next quarter and/or fiscal year gives financial analysts confidence that revenue and earnings targets will be met and substantiates higher valuations for a company's securities. Indeed, studies have found that backlog orders can provide an accurate prediction of future earnings.[2]

46.    This provides directors and officers with an incentive to engage in improper earnings management, which in this instance involves the "smoothing" of revenue and earnings from quarter to quarter by delaying or deferring the recognition of revenue and earnings from existing deals into future reporting periods once the current reporting period's targets are met.

47.    Prior to the filing with the SEC of the 2020 10-K, the Company only reported two revenue line items: license and services. Subscription and SaaS revenue was allocated between the license and services line items, with the bulk of subscription and SaaS revenue allocated to licenses. Beginning with the 2020 10-K, VMware began reporting subscription and SaaS revenue

---

[2] *See, e.g.*, Siva Rajgopal, Terry Shevlin, and Mohan Venkatachalam, *Does the Market Fully Appreciate the Implications of Leading Indicators for Future Earnings? Evidence from Order Backlog*, 8 Rev. Acct. Stud. 461-492 (2003).

as a separate line item, to align with industry demands, as the industry shifted away from license products in favor of subscription and SaaS. The Company represented in the 2020 10-K that: "management decided that revenue recognized from subscription and SaaS offerings will be presented separately as it provides a more meaningful representation of the nature of its revenue."

48.     The Company recognized revenue as it performed its obligations on existing deals. Deals that were made in one quarter, but that the Company expected to deliver and recognize in revenue the next quarter, were included in the Company's "backlog." The Company explains in the 2020 10-K:  "Backlog is comprised of unfulfilled purchase orders or unfulfilled executed agreements at the end of a given period and is net of related estimated rebates and marketing development funds." The Company separately disclosed the portion of backlog attributable to licenses.

### 3.     Rules Relevant to the Recognition of Revenue and Reporting of Backlog

49.     Financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 8, Chapter 1).

50.     FASB introduced into the Accounting Standards Codification ("ASC") as Topic 606, Revenue from Contracts with Customers. The standard is intended to improve the financial reporting of revenue and improve comparability of the top line in financial statements globally. In a May 28, 2014 press release, FASB noted that "[r]evenue is a vital metric for users of financial statements and is used to assess a company's financial performance and prospects," and further explained:  "The core principle of the new standard is for companies to recognize revenue to depict the transfer of goods or services to customers in amounts that reflect the consideration (that is, payment) to which the company expects to be entitled in exchange for those goods or services."

51.     Item 606 requires "an entity to disclose sufficient information to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers."

52.     A registrant should disclose its accounting policy for the recognition of revenue pursuant to FASB ASC Topic 235, Notes to Financial Statements.  FASB ASC 235-10-50-3 states that "the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue . . . ."  Because revenue recognition generally involves some level of judgment, a registrant should always disclose its revenue recognition policy.  If a company has different policies for different types of revenue transactions, the policy for each material type of transaction should be disclosed.  If sales transactions have multiple units of accounting, such as a product and service, the accounting policy should clearly state the accounting policy for each unit of accounting as well as how units of accounting are determined and valued.   An entity must disclose and explain any judgments, and modifications made as to previous judgments, "that significantly affect the determination of the amount and timing of revenue from contracts with customers."  *See* ASC 606-10-50-17.

53.     The SEC's principal disclosure requirement with respect to financial analysis is Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), set forth in Item 303 of Regulation S-K.  MD&A serves two important functions.  First, it is intended to explain factors that impacted financial results for the relevant period that may not be evident from the face of the financial statements themselves; in effect, to give investors an understanding of the company's financial results through the eyes of management.

54.     Second, MD&A requires companies to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on [results of operations, financial condition, or liquidity.]"  *See* 17 C.F.R. § 229.303.  This disclosure requirement encompasses a variety of actions taken by management during the quarter that could materially impact a future financial period, such as would be the case if a company manipulated reported backlog to make a quarterly target in a manner that would likely impact the next quarter.

55.     Regulation S-K Item 101 provides required disclosures for registrants' narrative description of its business.  Item 101(c)(viii) expressly guides the disclosure of backlog:

> The dollar amount of backlog orders believed to be firm, as of a recent date and as of a comparable date in the preceding fiscal year, together with an indication of the portion thereof not reasonably expected to be filled within the current fiscal year, and seasonal or other material aspects of the backlog.  (There may be included as firm orders government orders that are firm but not yet funded and contracts awarded but not yet signed, provided an appropriate statement is added to explain the nature of such orders and the amount thereof.  The portion of orders already included in sales or operating revenues on the basis of percentage of completion or program accounting shall be excluded.)

56.     The Individual Defendants caused VMware to file with the SEC financial statements and other required disclosures that did not meet the cited, and other, standards.  Far from presenting a view of the Company's financial condition and business prospects through the eyes of management, the financial statements and other disclosures set out below presented a view of the Company distorted through improper earnings management.  VMware manipulated its reported backlog in order to "smooth" reported revenue and earnings from quarter to quarter with an eye toward meeting financial analyst expectations and increasing compensation for directors and officers through both bonus compensation and insider sales at artificially inflated prices.  No disclosure of this practice was made by the Company its public filings with the SEC or other public statements.

57.     Notably, Dell's Annual Reports on Form 10-K filed with the SEC for at least the past ten years contain a frank admission of Dell's and its directors' and officers', including Defendants Michael Dell, Carty, and Durban, knowledge of the  manner in which backlog may be manipulated to meet revenue targets, stating:  "PRODUCT BACKLOG - We believe that product backlog is not a meaningful indicator of net revenue that can be expected for any period.  ***Our business model generally gives us flexibility to manage product backlog at any point in time*** by expediting shipping or prioritizing customer orders toward products that have shorter lead times, ***thereby reducing product backlog and increasing current period revenue***.  Moreover, product backlog at any point in time may not translate into net revenue in any subsequent period, as unfilled orders can generally be canceled at any time by the customer."

### 4. The SEC's Vigorous Enforcement of Policies Prohibiting Improper Earnings Management

58.     The Individual Defendants were well aware of the risks that their improper earnings management efforts posed to VMware and its stockholders.  Indeed, more than twenty years ago the SEC laid down the gauntlet to public companies engaging in improper earnings management by manipulating their financial reporting, including the reporting of backlog, to meet Wall Street expectations and to enhance executives' compensation both through bonus awards and insider stock sales.

59.     In 1998, Arthur Levitt, then-Chairman of the SEC, delivered a speech entitled "The Numbers Game" that signaled heightened scrutiny of improper earning management by registered companies.  Chairman Levitt cautioned that the use of improper earnings management "has evolved over the years into what can best be characterized as a game among market participants." He expressed concern that "the motivation to meet Wall Street earnings expectations may be overriding common sense business practices.  Too many corporate managers, auditors, and analysts are participants in a game of nods and winks.  In the zeal to satisfy consensus earnings estimates and project a smooth earnings path, wishful thinking may be winning the day over faithful representation."

60.     Chairman Levitt feared that the result of this "numbers game" is "an erosion in the quality of earnings, and therefore, the quality of financial reporting.  Managing may be giving way to manipulation; Integrity may be losing out to illusion."

61.     Finding that "integrity in financial reporting is under stress," Chairman Levitt talked about five "accounting gimmicks" the SEC had observed.  Among those "accounting gimmicks" were the use of "cookie jar reserves," wherein companies "stash accruals in cookie jars during the good times and reach into them when needed in the bad times."

62.     Also among the accounting gimmickry decried by Chairman Levitt were instances where "companies try to boost earnings by manipulating the recognition of revenue."

63.     Chairman Levitt warned that the SEC would implement guidance on "the dos and don'ts of revenue recognition" and that the "SEC's review and enforcement teams will reinforce

these regulatory initiatives.  We will formally target reviews of public companies that … appear to manage earnings."

64.    Since Chairman Levitt delivered those remarks over twenty years ago, the SEC has not hesitated to bring charges against companies that engage in improper earnings management in order to, among other things, meet market expectations.  Indeed, Dell itself was charged with violations of the federal securities laws for the use of "cookie jar" reserves, among other things.

65.    On July 22, 2010 the SEC filed suit against Dell, charging the company with "various disclosure and accounting violations ... from 2001 to 2006."  The SEC charged Dell with failing to disclose material information to investors and using fraudulent accounting to make it falsely appear that the company was consistently meeting Wall Street earnings targets and reducing its operating expenses.  The SEC's complaint alleged, among other things, that Dell's most senior accounting personnel engaged in improper accounting by maintaining a series of "cookie jar" reserves that it used to cover shortfalls in operating results from its 2002 fiscal year to its 2005 fiscal year.  Dell agreed to pay a $100 million penalty to settle the SEC's charges.

66.    "Accuracy and completeness are the touchstones of public company disclosure under the federal securities laws," said Robert Khuzami, Director of the SEC's Division of Enforcement. "Michael Dell and other senior Dell executives fell short of that standard repeatedly over many years, and today they are held accountable."

67.    Christopher Conte, Associate Director of the SEC's Division of Enforcement, added, "Dell manipulated its accounting over an extended period to project financial results that the company wished it had achieved, but could not.  Dell was only able to meet Wall Street targets consistently during this period by breaking the rules.  The financial results that public companies communicate to the investing public must reflect reality."

68.    The SEC clearly signaled its intention to closely watch the use of order backlog to engage in improper earnings management.   In its suit against Mercury Interactive, Inc. ("Mercury," now a part of Hewlett Packard), the SEC accused Mercury of using order backlog to manipulate revenue in order to meet or beat analysts' forecasts.  The SEC provided evidence to show that management built its order backlog by halting shipments to fill orders once analysts'

targets had been met.  The SEC pointed out that by failing to disclose its order backlog, Mercury had concealed the source of its revenue which misled investors and violated securities regulation §229 item 101(c) (viii).

69.    On September 8, 2008, Mercury (Hewlett Packard) agreed to pay a $28 million dollar fine and its outside directors each agreed to pay $100,000 fines.  On March 20, 2009, Mercury's CFO agreed to pay a fine of $2,712,914 and to be permanently barred from serving as an officer, a director or an accountant of a public company.  On February 21, 2013, Mercury's CEO agreed to pay a fine of $7,317,500 and to be barred for five years from serving as an officer or director of a public company.

70.    On June 8, 2009, the SEC announced that it had brought charges against Comverse Technologies, Inc. ("Comverse").  According to the Complaint, as a result of its improper conduct, Comverse was able to portray itself as a company with steady, but measured growth, which regularly met analysts' earnings targets.

71.    The SEC asserted that "Comverse improperly built up, and subsequently improperly released, certain reserves to meet earnings targets, improperly reclassified certain expenses to manipulate other performance metrics, and *made false disclosures about its backlog of sales orders*."  The accounting gimmickry employed had its intended effect:  "The manipulation of earnings allowed Comverse to meet or exceed Wall Street analysts' consensus earnings estimates in every quarter between 1996 and the first quarter of 2001."

72.    In resolution of the SEC's charges, Comverse and certain of its executives consented to the entry of a final judgment permanently enjoining them from violating the antifraud, reporting, record-keeping, and internal controls provisions of the federal securities laws. The executives also agreed to disgorgement of their ill-gotten gains.

73.    On July 2, 2018, the SEC charged global engineering and construction company KBR, Inc. ("KBR") "with inflating *a key, non-financial statement performance metric* known as work in *backlog*."  According to the SEC, KBR's public disclosures of its work in "backlog" were important to investors because the metric was supposed to represent the amount of revenue that KBR expected to receive in the future from "firm orders" under previously awarded contracts.

74.    In resolution of the charges, KBR consented to entry of an order by the SEC finding that the company violated Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 and the books and records, internal accounting controls, and reporting provisions of the Securities Exchange Act of 1934.  KBR was ordered by the SEC to pay a $2.5 million civil penalty.

75.    "*Non-financial statement metrics such as backlog can provide additional insight to investors regarding a company's performance*," said Shamoil T. Shipchandler, Director of the SEC's Fort Worth Regional Office.  "To the extent that companies disclose these kinds of metrics, *companies must ensure they are accurate and not misleading*."

76.    The SEC's aggressive pursuit of companies that distort the accurate reporting of their financial condition and business prospects through improper earnings management has been repeatedly signaled through lawsuits and regulatory actions, and is well-known throughout the investment community.  Indeed, a posting on the Harvard Law School Forum for Corporate Governance on February 28, 2020 observed:  "It's worth noting that *the SEC has not been reluctant to take enforcement action against companies that have misled investors by inflating* [Key Performance Indicators], such as subscriber counts, revenue-per-subscriber, number of vehicles sold monthly, net new customers added, *backlog* and now organic net sales growth and organic operating profit growth.  These types of metrics—typically outside of the financial statements—are metrics on which investors and analysts often rely to assess performance, and *companies have been held to account if their presentations are materially inaccurate or misleading or the related controls are inadequate*."

77.    Indeed, the SEC had taken issue with VMware's reporting regarding its backlog as far back as 2010.  On July 20, 2010, the Staff of the Division of Corporate Finance of the SEC provided comments to VMware regarding its Annual Report on Form 10-K filed with the SEC on March 1, 2010 for the fiscal year ended December 31, 2009.  The SEC Staff commented:

> We note that the increase in your deferred revenue is largely driven by increases in deferred maintenance revenue for which you are typically paid in advance.  We further note that the company enters into multi-year software maintenance contacts, particularly with your enterprise license agreements.  Please tell us when you invoice your customers for the multi-year software contracts (*i.e.* up-front, annually, etc.) and clarify whether the deferred revenue balance represents all unearned revenue due from your multi-year maintenance arrangements.  To the

extent that you do not invoice for the entire arrangement up-front, then tell us how you considered disclosing the amount of backlog orders (bookings) resulting from your recurring revenue arrangements pursuant to Item 101(c)(viii) of Regulation S-K.   In addition, to the extent that revenues recognized from your multi-year arrangements are expected to have a significant impact on the variability of your results, tell us your consideration to discuss and analyze changes in your backlog and bookings as part of your MD&A disclosures.

78.    On August 17, 2010, VMware assured the SEC Staff:    "The Company supplementally advises the Staff that, in connection with future filings with the Commission, to the extent that the Company determines that the impact of revenues recognized from multi-year arrangements would significantly impact the variability of our results, the Company will disclose such information in its future periodic reports, as applicable."

79.    The Individual Defendants are sophisticated, experienced business people that were well aware of the risks posed to VMware and its stockholders by improper earnings management, and other disclosure violations.   The Individual Defendants were required to investigate and take action to remediate such improper conduct, but failed to do so.   Had the Individual Defendants taken timely action, the damage incurred by VMware and its stockholders could have been prevented, or at least minimized.   Rather than take timely action, however, the Individual Defendants allowed the misconduct to go on, enriching the officers responsible with excessive compensation, to the detriment of VMware and its stockholders.

**B.    The Individual Defendants' Improper Earnings Management**

**1.    VMware's Second Quarter of its 2019 Fiscal Year**

80.    On August 23, 2018, Defendants Gelsinger, Rowe, Michael Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan caused VMware to file with the SEC a Current Report on Form 8-K attaching a press release disclosing the Company's financial results for the second quarter of its 2019 fiscal year.   The Company reported revenue for the quarter of $2.17 billion, an increase of 13% from the second quarter of fiscal 2018; GAAP operating income for the quarter of $509 million, an increase of 20% from the second quarter of fiscal 2018; and license revenue for the quarter of $900 million, an increase of 15% from the second quarter of fiscal 2018.

81.    The press release quoted Defendant Gelsinger as stating:    "Q2 was another strong quarter as we continue to see good momentum across our product and services portfolio in every

region."  Defendant Rowe was also quoted in the press release, stating:  "Our results in Q2 were driven by successful execution of our strategy and strong operational performance across the business.  Product license bookings grew double-digits year-over-year in all major product categories."

82.     That same day, VMware held a conference call with financial analysts regarding the Company's financial results reported for the second quarter of its 2019 fiscal year.  On the conference call, Defendant Rowe reported that VMware's license backlog in the quarter was $141 million, well above the $122 million license backlog reported at the end of its first quarter.

83.     Defendant Gelsinger also spoke on the conference call, representing that VMware was experiencing a "strong cycle" that would carry the Company through the long-term and "well into the future":

> [W]e believe we are in a strong cycle.  Customers are resonating with the VMware strategy.  Our execution is good and the market for technology is strong. And those are not this quarter statements.  Those are long-term statements where we think that the business performance, our growth rates, the ability of customers to invest in the strategic product portfolio that we have.  These are long-term trends and we believe that we're in a very good cycle for the business for not just this quarter, but well into the future.

84.     On September 11, 2018, Defendants Gelsinger, Rowe, Michael Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan caused VMware to file with the SEC its Quarterly Report on Form 10-Q for the second quarter of its 2019 fiscal year (the "2Q19 10-Q"). The Company reported in the 2Q19 10-Q that its "total backlog was $320 million, generally consisting of licenses, maintenance and services.  Our backlog related to licenses was $141 million, which [it] generally expect[s] to deliver and recognize as revenue during the following quarter."

85.     Appended as exhibits to the 2Q19 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Gelsinger and Rowe certified that the 2Q19 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in such [2Q19 10-Q] fairly presents, in all material respects, the financial condition and results of operations of VMware, Inc."  The SOX

certifications further attested to the accuracy of the financial statements, the disclosure of all fraud, and the effectiveness of the Company's internal controls over financial reporting.

86.    The above statements in ¶¶ 80-85 were materially false and misleading and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because they failed to disclose: (i) that the Company's accounting and disclosures, including with respect to its backlog, did not comply with applicable accounting principles and disclosure regulations; and (ii) that, as a result, the Company was reasonably likely to incur regulatory scrutiny, and lawsuits.

### 2.    VMware's Third Quarter of its 2019 Fiscal Year

87.    On November 29, 2018, Defendants Gelsinger, Rowe, Michael Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan caused VMware to file with the SEC a Current Report on Form 8-K attaching a press release disclosing the Company's financial results for the third quarter of its 2019 fiscal year.  In the press release, the Company reported revenue of $2.20 billion, an increase of 14% from the third quarter of the 2018 fiscal year; license revenue of $884 million, an increase of 17% from the third quarter of the 2018 fiscal year; and GAAP operating income of $495 million, an increase of 21% from the third quarter of the 2018 fiscal year.

88.    The press release quoted Defendant Gelsinger as stating:  "Q3 was another strong quarter, and we're pleased with our results, which continue to be driven by broad-based strength across our diverse product portfolio and in all three geographies."  Defendant Rowe also commented in the press release, stating that the Company would increase its guidance for revenue and earnings:  "We had solid Q3 performance on top of a strong Q3 last year.  We are increasing our full year fiscal 2019 guidance as a result of our strength in Q3 and outlook for Q4."

89.    After filing the 8-K, the Company held a conference call with financial analysts regarding its reported financial results for the third quarter of its 2019 fiscal year.  On the conference call, Defendant Rowe reported that the Company's license backlog for the quarter was $144 million, an increase from its second quarter license backlog of $141 million.  Rowe noted that "license backlog is the license portion of unfulfilled orders at quarter end."

90.     Also on the conference call, Defendant Rowe provided guidance for the Company's upcoming 2020 fiscal year, representing "[w]e expect the strength we're seeing in the business to continue next year and are currently planning on total revenue growth of approximately 12% for FY '20, which includes accelerating our growth in hybrid cloud subscription and SaaS." Defendant Gelsinger represented that the guidance for 12% growth reflected the strength the Company continues to see in its business and strategy.

91.     Defendant Rowe clarified that the positive outlook for the 2020 fiscal year provided by the Company "reflect[s] the strength we continue to see in the business."  Rowe further represented that the Company was comfortable with the revenue mix between license bookings and subscription and SaaS bookings, and felt "very confident heading into [the 2020 fiscal year]":

> So we're very comfortable – if you take it all in aggregate, we're comfortable with that mix.  We're comfortable with the SaaS mix and the hybrid cloud mix that we're growing here at VMware.  It's obviously highlighted in the guide for Q4 as well as in the guide for FY '20.  So nothing there I would call out other than the fact that the business is performing well and we feel very confident heading into the next year.

92.     On the conference call, a financial analyst from Deutsche Bank stated that the Company's preliminary guidance of 12% revenue growth in its 2020 fiscal year was "appreciably above" the growth that the analyst was modeling.  The analyst inquired whether "there [are] any other variables that might explain that good number that you'd care to highlight?"  Defendant Gelsinger responded:  "Sounds like you need to update your model."

93.     Defendant Rowe also responded, stating "[w]e're very pleased with the growth, as you all know, with all of the emerging parts of the portfolio that we would expect to see continued growth in next year."

94.     On December 10, 2018, Defendants Gelsinger, Rowe, Michael Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan caused VMware to file with the SEC its Quarterly Report on Form 10-Q for the third quarter of its 2019 fiscal year (the "3Q19 10-Q").  In the 3Q19 10-Q, the Company reported that VMware's "total backlog was $324 million."  Of that

total, the "backlog related to licenses was $144 million, which [VMware] generally expect[s] to deliver and recognize as revenue during the following quarter."

95.     Appended as exhibits to the 3Q19 10-Q were SOX certifications, wherein Defendants Gelsinger and Rowe certified that the 3Q19 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in such [3Q19 10-Q] fairly presents, in all material respects, the financial condition and results of operations of VMware, Inc."  The SOX certifications further attested to the accuracy of the financial statements, the disclosure of all fraud, and the effectiveness of the Company's internal controls over financial reporting.

96.     The above statements in ¶¶ 87-95 were materially false and misleading and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because they failed to disclose: (i) that the Company's accounting and disclosures, including with respect to its backlog, did not comply with applicable accounting principles and disclosure regulations; and (ii) that, as a result, the Company was reasonably likely to incur regulatory scrutiny, and lawsuits.

### 3.     VMware's Fourth Quarter and Full Year Fiscal 2019

97.     On February 28, 2019, Defendants Gelsinger, Rowe, Michael Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan caused VMware to file with the SEC a Current Report on Form 8-K attaching a press release disclosing the Company's results of operations for the quarter and fiscal year ended February 1, 2019, *i.e.*, the fourth quarter of the 2019 fiscal year and the full 2019 fiscal year.  The press release quoted Defendant Gelsinger as stating: "Q4 was a terrific ending to a strong fiscal '19 driven by broad-based strength across our diverse product portfolio and in all three geographies."

98.     Also on February 28, 2019, VMware conducted a conference call with financial analysts regarding its reported financial results.  On the conference call, Defendant Gelsinger remarked that "Q4 was a terrific ending to a strong fiscal '19," with growth "driven by broad-based strength across our diverse product portfolio in all 3 geographies," and that the Company was "very pleased with this terrific quarter and fiscal '19."

99. Defendant Rowe also spoke on the conference call, claiming "broad-based strength across the business," and "record results in both Q4 and fiscal '19 for license revenue." Rowe reported that VMware had license backlog of $147 million, an increase from the $144 million license backlog reported for the third quarter.

100. A financial analyst from Deutsche Bank expressed concern about the Company's reported growth in the face of weakness in the industry:

> It felt to me like in 2018, that every single tech supplier exposed to infrastructure IT had a terrific year, but in the last month-or-so, we've seen weakness from Intel, NVIDIA, NetApp, HP, and now Nutanix tonight, and yet you just posted one of your strongest revenue growth quarters in years. And I'm wondering if you could just explain that apparent divergence. Is it a function of the emerging products becoming a larger portion of the mix? Is it enterprise demand maybe transitioning from hardware to more software defined? Your thoughts will be welcome."

101. In response to the concerns expressed by the Deutsche Bank analyst, Defendant Gelsinger responded that VMware was a "winner" in a market full of "winners and losers," and that he was "really happy with our performance."

102. After reporting strong license growth for its 2019 fiscal year, the Company upwardly revised guidance for its 2020 fiscal year.

103. On March 1, 2019, the day after Defendants Gelsinger and Rowe disclosed record license backlog to end the fourth quarter of the Company's 2019 fiscal year, Defendant Gelsinger sold over 21,000 shares of VMware stock to yield almost $3.8 million in proceeds. All told, from March 1, 2019 through May 2, 2019 VMware executives, including Defendants Gelsinger and Rowe, sold $58.9 million of VMware stock at inflated prices, at prices as high as $204.83 per share.

104. On March 29, 2019, Defendants Gelsinger, Rowe, Michael Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan signed and caused the Company to file with the SEC its Annual Report on Form 10-K for the 2019 fiscal year, ended February 1, 2019 (the "2019 10-K"). In the 2019 10-K, the Company reported total revenue of $8.974 billion and net income of $2.422 billion. Regarding the Company's backlog, the 2019 10-K stated, in relevant part:

> Backlog is comprised of unfulfilled purchase orders or unfulfilled executed agreements at the end of a given period and is net of related estimated rebates and marketing development funds. As of February 1, 2019, *our total backlog was*

*approximately $449 million.*  Backlog primarily consists of licenses, maintenance and services.  ***Our backlog related to licenses was approximately $147 million***, which we generally expect to deliver and recognize as revenue during the following quarter.  As of February 2, 2018, total backlog was approximately $285 million and backlog related to licenses was approximately $99 million.

The amount and composition of backlog will fluctuate period to period, and backlog is managed based upon multiple considerations, including product and geography.  We do not believe that the amount of backlog is indicative of future sales or revenue or that the mix of backlog at the end of any given period correlates with actual sales performance of a particular geography or particular products or services.

105.    Appended as exhibits to the 2019 10-K were signed SOX certifications, wherein Defendants Gelsinger and Rowe certified that the 2019 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in such [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of VMware, Inc."  The SOX certifications further attested to the accuracy of the financial statements, the disclosure of all fraud, and the effectiveness of the Company's internal controls over financial reporting.

106.    The above statements in ¶¶ 97-99, 101-102, 104-105 were materially false and misleading and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because they failed to disclose: (i) that the Company's accounting and disclosures, including with respect to its backlog, did not comply with applicable accounting principles and disclosure regulations; and (ii) that, as a result, the Company was reasonably likely to incur regulatory scrutiny, and lawsuits.

### 4.    VMware's False and Misleading Proxy Statement

107.    On May 13, 2019, Defendants Gelsinger, Michael Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan caused VMware to issue a definitive proxy statement soliciting stockholder votes in advance of the Company's Annual Meeting of Stockholders to be held June 25, 2019 (the "Proxy Statement").  In the Proxy Statement, these eight Defendants solicited stockholder votes in favor of five management proposals, including: (i) a proposal to elect Carty and Sagan to new terms as directors of the Company; (ii) a proposal to approve an amendment to

the 2007 Equity and Incentive Plan ("Incentive Plan"); and (iii) a proposal to approve an amendment to the 2007 Employee Stock Purchase Plan ("Purchase Plan").

108.    The Proxy Statement disclosed that the Board had determined that Defendants Gelsinger, Michael Dell, and Durban were not independent:  "Ownership interests of our directors or officers in the common stock of Dell, or service as both a director of Dell and VMware, or as a director of VMware and an officer or employee of Dell could create, or appear to create, potential conflicts of interest when directors and officers are faced with decisions that could have different implications for us and Dell."

109.    Regarding corporate governance with respect to financial statements, the Proxy Statement stated, in relevant part:

> Our Audit Committee oversees management of financial risk exposures, including the integrity of our accounting and financial reporting processes and controls. As part of this responsibility, the Audit Committee meets periodically with the independent auditor, our internal auditors and our financial and accounting personnel to discuss significant financial risk exposures and the steps management has taken and will take to monitor, control and report such exposures. Additionally, the Audit Committee reviews significant findings prepared by the independent auditor and our internal auditors, together with management's related responses. Our Audit Committee also oversees management's compliance with applicable legal and regulatory requirements and the risks related to potential non-compliance, including those related to cybersecurity matters and concerns, information security and data privacy. The Audit Committee reviews periodic reports from our Chief Ethics and Compliance Officer, our Chief Information Security Officer ("CISO"), our internal auditors and our independent auditor. Finally, the Audit Committee has primary oversight responsibility for matters relating to enterprise risk. As such, the charter for our Audit Committee provides for periodic reviews and discussion of our practices and policies with respect to risk assessment and risk management with an enterprise risk management committee comprised of senior members of the Company's management team.

110.    Regarding non-employee director compensation, the Proxy Statement informed stockholders that each of Defendants Bates, Brown, and Carty received compensation from VMware for their service on the Board during the 2019 fiscal year ranging between $357,688 and $412,688.    Moreover, Defendants Dykstra and Sagan received $641,939 and $648,911, respectively, in non-employee director compensation in the Company's 2019 fiscal year.    The Proxy Statement further informed stockholders that Defendants Gelsinger and Rowe received compensation of $23,569,191 and $12,127,622, respectively, as officers of the Company in its 2019 fiscal year.

111.    In addition to this excessive compensation, the Incentive Plan authorizes the issuance of Class A common stock to VMware's non-employee directors and employees, including the executive officers.  The Proxy Statement contained the representation that, as of March 1, 2019, 12,093,046 shares of Class A common stock were available for future grants pursuant to the Incentive Plan.

112.    Equity pursuant to the Incentive Plan is effectively awarded at the discretion of the Board.  Specifically, the Proxy Statement disclosed:

> **Administration**. The CCG Committee administers the Incentive Plan. The CCG Committee has the ability to: select individuals to receive awards; select the types of awards to be granted; determine the terms and conditions of the awards, including the number of shares, the purchase price of the awards and restrictions and performance goals relating to any award; establish the time when the awards or restrictions become exercisable, vest or lapse; determine whether options will be incentive stock options or nonqualified stock options; determine whether and to what extent an award may be settled, canceled, forfeited, accelerated, exchanged or surrendered (including upon a "change in control" or similar transaction); and make all other determinations deemed necessary or advisable for the administration of the Incentive Plan.

113.    The Proxy Statement solicited stockholder approval of an amendment to the Incentive Plan to increase the number of shares of Class A common stock reserved for issuance thereunder by 13 million shares, informing stockholders that, if approved, the total number of shares reserved for issuance would be 25,093,046 shares of Class A common stock, which represented 22.6% of the Company's Class A common stock outstanding as of March 1, 2019.

114.    Further, the Purchase Plan authorizes the issuance of Class A common stock to VMware's employees to provide them with the opportunity to purchase shares at a discounted price as an incentive for continued employment.  The Proxy Statement informed stockholders that, as of March 1, 2019, 6,091,377 shares of Class A common stock were available for future grants pursuant to the Purchase Plan.

115.    Equity pursuant to the Purchase Plan is effectively awarded at the discretion of the Board.  Specifically, the Proxy Statement stated:

> **Administration, Amendment and Termination**. The Board or a committee of the Board (currently the CCG Committee) administers the Purchase Plan, makes determinations regarding all questions arising thereunder, and adopts, administers and interprets such rules and regulations relating to the Purchase Plan as it deems necessary or advisable. The Board may generally amend or terminate the Purchase

Plan at any time. However, the Board must obtain stockholder approval for any amendment to the Purchase Plan that increases the number of shares of Class A Stock issuable under the Purchase Plan, reduces the option price of outstanding options or the price at which options can be granted, or modifies the requirements for eligibility to participate in the Purchase Plan.

116.    The Proxy Statement also solicited stockholder approval of an amendment to the Purchase Plan to increase the number of shares of Class A common stock reserved for issuance thereunder by 9 million shares.  The Proxy Statement informed stockholders that, if approved, the total number of shares reserved for issuance would be 15,091,377 shares of Class A common stock, which represented 13.6% of the Company's Class A common stock outstanding as of March 1, 2019.

117.    The  Proxy Statement was materially false and misleading for the following reasons: (i) it misrepresented the accuracy of VMware's financial statements, including with respect to its backlog; (ii) it misrepresented the Board's actual activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties and engaging in other misconduct; and (iii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation.  A reasonable stockholder would have found the truth to be material when deciding whether to vote for or against the proposals for which the Board solicited votes.

### 5.    VMware's First Quarter of its 2020 Fiscal Year

118.    On May 30, 2019, Defendants Gelsinger, Rowe, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan caused VMware to file with the SEC a Current Report on Form 8-K attaching a press release announcing the Company's results of operations for the first quarter of its 2020 fiscal year, ended May 3, 2019.  The press release disclosed total revenue growth of 13% year-over-year; total revenue for the first quarter of $2.27 billion, an increase of 13% from the first quarter of fiscal 2019; and license revenue for the first quarter of $869 million, an increase of 12% from the first quarter of fiscal 2019.  In the press release, remarking on behalf of the Company, Defendant Gelsinger stated "Q1 was a good start to fiscal 2020 with strength across our comprehensive solutions portfolio."

119.    The press release also announced that the Board had "authorized the repurchase of up to $1.5 billion of its Class A common stock through fiscal 2021, which ends on January 29, 2021."  This authorization was "in addition to the Company's ongoing $1 billion stock repurchase program announced in August 2017, which had $243 million remaining at the end of the first quarter."

120.    After the filing of the 8-K, the Company held an analyst conference call regarding the reported financial results for the first quarter of its 2020 fiscal year.  On the conference call, Defendant Gelsinger stated that the Company's "revenue for the quarter increased 13% year-over-year," and remarked that the Company was "very well positioned to execute on our plans for the full year."

121.    Defendant Rowe also spoke on the conference call, representing that in the first quarter total revenue grew 13% and license revenue increased 12% year-over-year, and detailed that the Company's "[g]rowth in revenue, plus the sequential change in unearned revenue for the quarter, was 25% or up 20% when excluding an ASC 606 reclassification adjustment, which reduced unearned revenue in Q1 of fiscal '19."  Defendant Rowe further reported that "[l]icense revenue, plus the sequential change in unearned license revenue, grew 23% year-over-year or up 17%, excluding the same 606 reclassification adjustment in Q1 of '19."

122.    On the conference call a dramatic reduction in backlog was reported.  Defendant Rowe disclosed:  "We exited Q1 with $48 million of license backlog compared to $147 million at the end of Q4 FY '19."  Despite the backlog reduction, Rowe assured that "Q1 was a good start to FY '20, and we're maintaining our positive outlook for the year," including full-year "total revenue growth of 11.8% year-over-year to $10.030 billion," as well as "[l]icense revenue growth of 12.8% to $4.275 billion."  Defendant Rowe provided guidance for the second quarter of the Company's 2020 fiscal year:  "For Q2 FY '20, total revenue is expected to be $2.425 billion, up 11.5% year-over-year with license revenue of $1 billion, an increase of 11.1% year-over-year."

123.    On the conference call, a financial analyst sought clarification regarding VMware's maintaining its positive guidance despite other companies' experiencing market softness:

And I don't want to spend too much time on that because it was really strong results here. But VMware side, I guess, Pat [Gelsinger] and Zane [Rowe], too, if you have anything to contribute here, you have a view that we don't have, right? Like why do you think so many others are seeing some softness out there? Because they are. I mean, I got 3 companies tonight and you guys are a lot better than the other 2. I don't know.

Is it – are there hardware issues out there? Like, with tariffs and other things, which has now trickled to infrastructure software and then apps? But that seems too early for something like that to happen. Do you have anything you can share with us here? And also, why hasn't this really affected you?

124.     Defendant Gelsinger responded to the inquiry as he had done in the past, asserting that VMware was a "winner" with regard to technology trends:

We do think that some of the macroeconomic effects, that will affect everybody, right, in that environment. As you've heard me say before, there's going to be some winners and losers on different technology trends inside of that.

Overall, we continue to be optimistic. We continue to be optimistic on the long-term view of the market, that IT growth is going to outpace GDP growth, enterprise as a software growth will outpace IT growth. We see this sort of tech breaking out of tech and more businesses, right, being – becoming centered on their technology differentiation.

Clearly, some of the trade aspects, some of the different cyclicality going on affects different players. But overall, we remain optimistic. Our strategy is resonating well into the future and super pleased with the execution of my team to deliver a very solid quarter.

125.     Defendant Rowe backed up Gelsinger's response:

John, I would just add to Pat's point. We're not immune to it. We feel good about the start of the year, as you pointed out, and we feel like we've had some consistency as we thought about the year and it's playing out to some degree and to some extent as we expected.

I'll also point out the customer ROI for their investment in our product portfolio is strong. So I think that resonates. I think the strategy resonates and we're benefiting from that. I think some of what you're seeing across the broader landscape is some volatility and obviously uncertainty tied to the macroeconomic environment. But beyond that, we're comfortable with what we're seeing early and feel good about our forecast for the year.

126.     Defendant Gelsinger responded to a different financial analyst that "we're feeling quite good about the momentum that we see going into Q2 and for the second half." Defendant Rowe again seconded Gelsinger's remarks, representing that he was "comfortable with how [VMware is] positioned for the year," despite "some of our competitors seeing a little bit of weakness and some volatility and variability quarter-to-quarter."

127.    The same day, Defendants revealed that the leader of VMware's Americas segment left the Company in February 2019.  As a result, the Americas segment was forced to undergo a restructuring, which resulted in deal execution problems and a subsequent slowdown in revenue for that region in the first quarter of the Company's 2020 fiscal year.

128.    Following the Company's May 30, 2019 disclosures, VMware's stock price declined over 7%.

129.    On June 10, 2019, Defendants Gelsinger, Rowe, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan caused VMware to file with the SEC its Quarterly Report on Form 10-Q for the first quarter of its 2020 fiscal year, ended May 3, 2019 (the "1Q20 10-Q").  The 1Q20 10-Q affirmed the previously reported financial results.  Regarding backlog, the Company stated:

> Backlog is comprised of unfulfilled purchase orders or unfulfilled executed agreements at the end of a given period and is net of related estimated rebates and marketing development funds.  As of May 3, 2019, *our total backlog was $180 million*.  Backlog primarily consists of licenses, maintenance and services.  *Our backlog related to licenses was $48 million*, which we generally expect to deliver and recognize as revenue during the following quarter.  Backlog totaling $17 million as of May 3, 2019 was excluded from the remaining performance obligations because such contracts are subject to cancellation until fulfillment of the performance obligation occurs.  As of February 1, 2019, our total backlog was approximately $449 million and our backlog related to licenses was approximately $147 million.  Backlog totaling $34 million as of February 1, 2019 was excluded from the remaining performance obligations because such contracts are subject to cancellation until fulfillment of the performance obligation occurs.

> The amount and composition of backlog will fluctuate period to period, and backlog is managed based upon multiple considerations, including product and geography. We do not believe the amount of backlog is indicative of future sales or revenue or that the mix of backlog at the end of any given period correlates with actual sales performance of a particular geography or particular products and services.

130.    Appended as exhibits to the 1Q20 10-Q were SOX certifications, wherein Defendants Gelsinger and Rowe certified that the 3Q19 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in such [3Q19 10-Q] fairly presents, in all material respects, the financial condition and results of operations of VMware, Inc."  Other than "the implementation of a new lease accounting software and related controls to enable us to adopt Topic 842, Leases," the 1Q20 10-Q represented

that "[t]here were no other changes in our internal control over financial reporting during the most recent fiscal quarter ended May 3, 2019 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

131.    According to the 1Q20 10-Q, during the quarter ended May 3, 2019, VMware purchased 3,264,000 shares of its Class A common stock for approximately $591 million at an artificially inflated average price of $180.96 per share.

132.    The above statements in ¶¶ 118-130 were materially false and misleading and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because they failed to disclose: (i) that the Company's accounting and disclosures, including with respect to its backlog, did not comply with applicable accounting principles and disclosure regulations; and (ii) that, as a result, the Company was reasonably likely to incur regulatory scrutiny, and lawsuits.

133.    On June 20, 2019, Deutsche Bank published a research report on VMware after meeting with Defendant Rowe and the Company's Chief Operating Officer.  The analyst noted in the report the key takeaways from the meeting, including that the Americas segment reorganization was partly done to better align the Company with Dell's go-to-market structure and that "***the sales territory realignment may have caused some unexpected disruption***." As a result of the conversation, the Deutsche Bank analyst believed that "on the margin, the reorg[anization] weighed on the decision to reaffirm and not raise the FY20 guidance."

134.    The Deutsche Bank analyst also noted that inquiry was made as to "the steep decline in the license backlog reported last quarter."  According to the analyst, Defendant Rowe merely responded:  "deal timing."

### 6.    VMware's Second Quarter of its 2020 Fiscal Year

135.    On August 22, 2019, Defendants Gelsinger, Rowe, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan caused VMware to file with the SEC a Current Report on Form 8-K attaching a press release disclosing the Company's financial results of operations for the second quarter of its 2020 fiscal year, ended August 2, 2019.  In the press release, the Company announced net income of $4.93 billion; revenue of $2.44 billion, an increase of  12% from the

second quarter of fiscal 2019; and license revenue of $1.01 billion, an increase of 12% from the second quarter of fiscal 2019.

136.    Defendant Gelsinger was quoted in the press release as stating the Company was "[b]uilding on another solid quarter."  Defendant Rowe was quoted in the press release as stating: "We are pleased with our strong financial performance in Q2, which reflected broad-based strength in all three geographies."

137.    After the filing of the 8-K, the Company held an analyst conference call.  On the conference call, Defendant Gelsinger again represented that total revenue for the quarter increased 12% year-over-year.    Defendant Rowe followed up, stating:    "We're pleased with our performance in Q2.  We reported 12% year-over-year growth in total revenue and license revenue driven by strength across our broad products and solutions portfolio in all 3 geographies."

138.    VMware again reported a dramatic change in license backlog.  Defendant Rowe disclosed that, at the end of the second quarter of the 2020 fiscal year, VMware "had license backlog of $13 million and total backlog of $117 million," which represented a massive 74% reduction from the $449 million total backlog reported at the end of the 2019 fiscal year and a 35% reduction from the prior quarter.  The $13 million license backlog represented a 73% decline in license backlog from the previous quarter, and a 91% decline over the course of six months.

139.    On the conference call, Defendant Rowe represented:  "We're forecasting growth in total revenue plus the sequential change in total unearned revenue to be approximately 13% year-over-year in the quarter and up about 2 percentage points versus Q3 FY '19."  Guidance for the Company's license revenue in the second half of its 2020 fiscal year was reduced.  The lowered guidance was attributed to customers' shift away from licenses toward subscription and SaaS, revenues from which are ratably recognized over the subscription term.

140.    On the conference call, an analyst asked whether the progression to subscription and SaaS products would "suppress license growth."  Defendant Rowe responded that the Company "can grow both the perpetual [license] side of the business as well as grow the SaaS side."

141.    On September 9, 2019, Defendants Gelsinger, Rowe, Michael Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan caused VMware to file with the SEC its Quarterly Report on Form 10-Q for the second quarter of its 2020 fiscal year, ended August 2, 2019 (the "2Q20 10-Q"). The 2Q20 10-Q affirmed the previously reported financial results. Regarding backlog, the 2Q20 10-Q stated, in relevant part:

> Backlog is comprised of unfulfilled purchase orders or unfulfilled executed agreements at the end of a given period and is net of related estimated rebates and marketing development funds. As of August 2, 2019, *our total backlog was $117 million*. Backlog primarily consists of licenses, maintenance and services. *Our backlog related to licenses was $13 million*, which we generally expect to deliver and recognize as revenue during the following quarter. Backlog totaling $9 million as of August 2, 2019 was excluded from the remaining performance obligations because such contracts are subject to cancellation until fulfillment of the performance obligation occurs. As of February 1, 2019, our total backlog was approximately $449 million and our backlog related to licenses was approximately $147 million. Backlog totaling $34 million as of February 1, 2019 was excluded from the remaining performance obligations because such contracts are subject to cancellation until fulfillment of the performance obligation occurs.
>
> The amount and composition of backlog will fluctuate period to period, and backlog is managed based upon multiple considerations, including product and geography. We do not believe the amount of backlog is indicative of future sales or revenue or that the mix of backlog at the end of any given period correlates with actual sales performance of a particular geography or particular products and services.

142.    The 2Q20 10-Q also contained representations substantively identical to those made in prior SEC filings concerning VMware's internal controls and procedures, and the lack of any changes in its internal control over financial reporting that materially affected, or are reasonably likely to materially affect, such reporting; risk warnings about the Company's disclosure controls and procedures and internal control over financial reporting.

143.    Appended as exhibits to the 2Q20 10-Q were signed SOX certifications, wherein Defendants Gelsinger and Rowe certified that 2Q20 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in such [2Q20 10-Q] fairly presents, in all material respects, the financial condition and results of operations of VMware, Inc." The SOX certifications further attested to the accuracy of the financial statements, the disclosure of all fraud, and the effectiveness of the Company's internal controls over financial reporting.

144.    According to the 2Q20 10-Q, during the quarter ended August 2, 2019, VMware purchased 2,431,000 shares of its Class A common stock for approximately $446 million at an artificially inflated average price of $183.53 per share.

145.    The above statements in ¶¶ 135-143 were materially false and misleading and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because they failed to disclose: (i) that the Company's accounting and disclosures, including with respect to its backlog, did not comply with applicable accounting principles and disclosure regulations; and (ii) that, as a result, the Company was reasonably likely to incur regulatory scrutiny, and lawsuits.

### 7.    VMware's Third Quarter of its 2020 Fiscal Year

146.    On November 26, 2019, VMware filed with the SEC a Current Report on Form 8-K attaching a press release announcing the Company's financial results for the third quarter of its 2020 fiscal year, ended November 1, 2019.   VMware reported total revenue of $2.46 billion, reflecting growth of 12% year-over-year, license revenue of $974 million, reflecting growth of 10% year-over-year, and net income of $621 million.

147.    The Company further reported that "[t]otal revenue plus sequential change in total unearned revenue grew 18% year-over-year," or 12% year-over-year excluding the excluding the unearned revenue assumed by the Company with its acquisition of Carbon Black[3], while at the same time, "[l]icense revenue plus sequential change in unearned license revenue grew 21% year-over-year," or 13% excluding unearned revenue assumed during the acquisition.

148.    Defendant Gelsinger was quoted in the press release as stating:  "'Q3 was another solid quarter for VMware, and we're pleased with our results.   We continue to see traction and customer momentum in support of VMware's vision to deliver a software architecture that enables any app, on any cloud, delivered to any device.'"   Defendant Rowe added:  "'We're pleased with

---

[3] On October 8, 2019, VMware announced that it had completed its acquisition of Carbon Black, a cybersecurity firm.

1  our financial performance and execution this quarter, which reflected broad-based strength across

2  our product and solutions portfolio.'"

3      149.    After the 8-K was filed, the Company held an analyst conference call.  On the

4  conference call, Defendant Gelsinger represented that "Q3 was another solid quarter for VMware,

5  and we're pleased with our results.  We continue to see traction and customer momentum in

6  support of VMware's vision to deliver a software architecture that enables any app, on any cloud,

7  delivered to any device."  Defendant Gelsinger reported that "[i]n Q3, total revenue increased 12%

8  year-over-year."

9      150.    Defendant Rowe also spoke on the conference call, stating "[w]e're pleased with

10 our financial performance and execution this quarter, which resulted in total revenue growth of

11 12% and license revenue growth of 10% year-over-year."  However, Defendant Rowe then

12 announced yet another significant reduction in the Company's license backlog:  "At quarter end,

13 we had license backlog of $33 million and total backlog of $71 million."

14      151.    Defendant Rowe announced that the Company was upping its revenue guidance for

15 its 2020 fiscal year, stating:  "For the full year, we are projecting an increase in total revenue to

16 $10,100,000,000, up 12.5% year-over-year.  This includes the addition of Carbon Black's

17 financials post close, which accounts for the largest portion of the revenue increase.  We expect

18 license revenue of $4,245,000,000 for FY '20, up 12% year-over-year."  Defendant Rowe also

19 provided guidance for the fourth quarter of the Company's 2020 fiscal year, stating:  "[m]oving to

20 our Q4 guidance.  License revenue is expected to be $1,390,000,000, an increase of 13% year-

21 over-year, and total revenue is expected to be $2,950,000,000, up 13.8% year-over-year."

22      152.    Defendant Rowe reiterated that the Company had a strong third quarter of its 2020

23 fiscal year, and expected to continue reporting strong financial results with a solid pipeline of

24 bookings heading into the fourth quarter of its 2020 fiscal year, as reflected in the Company's

25 Remaining Performance Obligations ("RPO") line item, within which license backlog was

26 included:

27          As you point out, we saw really good booking strength in the quarter. And we have
            a solid guide for the rest of the year. I talked about RPO, which, for the third
28          quarter, was $8.5 billion, which has also grown nicely year-over-year, reflecting the

ongoing strength of the business. So yes, we feel good about the guide. We feel good about our pipeline heading into Q4.

153.    Responding to a separate analyst question about the Company's revenue guidance for the fourth quarter and full-year of the Company's 2021 fiscal year, Defendant Rowe reiterated that VMware's revenue guidance was driven by the Company's pipeline heading into the fourth quarter:

But again, if you recall, the guide also highlighted some of the growth that we're anticipating for the second half of the year based on what we said last quarter.

So we feel really good about the pipeline heading into the fourth quarter and the solid guide for the year.

154.    Defendant Rowe represented that the Company "feel[s] good about the trajectory heading into next year":

[A]s we called out, as we called out in the third quarter, it was more pronounced on the license revenue side, and what we've generally done is steered you more towards total revenue and with the strength we've seen in the third quarter, candidly, in both categories.  I mean as you know, hybrid cloud subscription and SaaS, while we get the bookings now, we recognize the revenue over an extended period of time.  And that's sort of the nuance when you're thinking about the balance between license revenue versus hybrid cloud subscription SaaS.  That's sort of the balance that we were contemplating in the third quarter.  And we mentioned, with that strength, we saw the guide continue through the year.

So there's always a little bit of headwind, especially as you're growing that just because you essentially recognize the revenue slightly differently.  We wouldn't call it out specifically as far as a percent because I think all of our – when we think about those businesses, they're all in different points on the maturity curve.  But in aggregate, you're right, there's always that balance when you're considering a perpetual model versus the SaaS model, but we're comfortable with that balance.  We've maintained the annual guide.  We feel good about the trajectory heading into next year.

155.    On December 6, 2019, the Individual Defendants caused VMware to file with the SEC a Quarterly Report on Form 10-Q for the third quarter of its 2020 fiscal year, ended November 1, 2019 (the "3Q20 10-Q").  The 3Q20 10-Q affirmed the previously reported financial results. Regarding backlog, the report stated, in relevant part:

Backlog is comprised of unfulfilled purchase orders or unfulfilled executed agreements at the end of a given period and is net of related estimated rebates and marketing development funds.  As of November 1, 2019, *our total backlog was $71 million*.  Backlog primarily consists of licenses, maintenance and services.  *Our backlog related to licenses was $33 million*, which we generally expect to deliver and recognize as revenue during the following quarter.  Backlog totaling $10 million as of November 1, 2019 was excluded from the remaining performance

obligations because such contracts are subject to cancellation until fulfillment of the performance obligation occurs. As of February 1, 2019, our total backlog was approximately $449 million and our backlog related to licenses was approximately $147 million. Backlog totaling $34 million as of February 1, 2019 was excluded from the remaining performance obligations because such contracts are subject to cancellation until fulfillment of the performance obligation occurs.

The amount and composition of backlog will fluctuate period to period, and backlog is managed based upon multiple considerations, including product and geography. We do not believe the amount of backlog is indicative of future sales or revenue or that the mix of backlog at the end of any given period correlates with actual sales performance of a particular geography or particular products and services.

156.    The 3Q20 10-Q also contained representations substantively identical to those made in prior SEC filings concerning VMware's internal controls and procedures, and the lack of any changes in its internal control over financial reporting that materially affected, or are reasonably likely to materially affect, such reporting; risk warnings about the Company's disclosure controls and procedures and internal control over financial reporting.

157.    Appended as exhibits to the 3Q20 10-Q were signed SOX certifications, wherein Defendants Gelsinger and Rowe certified that the 3Q20 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in such [3Q20 10-Q] fairly presents, in all material respects, the financial condition and results of operations of VMware, Inc." The SOX certifications further attested to the accuracy of the financial statements, the disclosure of all fraud, and the effectiveness of the Company's internal controls over financial reporting.

158.    According to the 3Q20 10-Q, during the quarter ended November 1, 2019, VMware purchased 1,638,000 shares of its Class A common stock for approximately $242 million at an artificially inflated average price of $147.65 per share.

159.    The above statements in ¶¶ 146-157 were materially false and misleading and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because they failed to disclose: (i) that the Company's accounting and disclosures, including with respect to its backlog, did not comply with applicable accounting principles and disclosure regulations; and (ii) that, as a result, the Company was reasonably likely to incur regulatory scrutiny, and lawsuits.

**8.    VMware Discloses that the SEC is Investigating its Reported Backlog**

160.    On February 27, 2020, VMware issued a press release announcing financial results for the fourth quarter and full year fiscal 2020.  In the press release, VMware disclosed that it would not meet its license and total revenue guidance for the fourth quarter and full year of its 2020 fiscal year.  The Company also revealed that its total backlog had declined to only $18 million, which included just $5 million in license backlog – a decline of 96% and 97% for total and license backlog, respectively, from the fourth quarter of its 2019 fiscal year.  As explained by Defendant Rowe, the Company's backlog was a driver for the disappointing results as "in Q4 last year, we had . . . strong backlog that we were able to utilize."

161.    In a Current Report on Form 8-K filed with the SEC the same day, the Company disclosed that it was subject to an ongoing SEC investigation:  "In December 2019, the staff of the Enforcement Division of the Securities and Exchange Commission requested documents and information related to VMware's backlog and associated accounting and disclosures."  In the 8-K, stockholders were assured that "VMware is fully cooperating with the SEC's investigation," but that it was "unable to predict the outcome of this matter at this time."

162.    On an analyst conference call held that day, Defendant Gelsinger disclosed that "revenue came in a bit short of expectations due to a higher mix of subscription and SaaS."

163.    The revenue shift toward subscription and SaaS products resulted in VMware reclassifying its revenue line items to specifically include subscription and SaaS as an individual line item, along with license and services.  The Company warned stockholders to "expect on-premises license revenue to fluctuate more on a quarter-by-quarter basis than what we've seen previously.  This is driven by a higher percent of subscription and SaaS being sold as well as the variability of large deals between quarters that have historically had a large license revenue impact."

164.    The Company's stock price dropped to a 52-week low of $120.52 per share the next day.

165.    On March 2, 2020, Bloomberg Intelligence issued a research report on VMware. The report noted that "given $2.7 billion of debt maturing within a year, short-term liquidity is

critical" for the Company.  The ability to "quickly rebuild cash levels," however, was contingent on a stock "buybacks decrease."

166.    On March 26, 2020, the Individual Defendants caused VMware to file the 2020 10-K for the fourth quarter and full 2020 fiscal year, ended January 31, 2020.  Therein, the Company stated that between November 2, 2019 and November 29, 2019, the Company repurchased 330,700 shares of its Class A common stock for approximately $54.9 million at an artificially inflated average price of $166.29 per share.  Thus, during its 2020 fiscal year, ended January 31, 2020, the Individual Defendants caused the Company to repurchase a total of 7,664,000 of its own Class A common stock in the open market at the weighted average price per share of $174.02, for a total of $1.334 billion.

167.    The revelation regarding, among other things, the SEC investigation precipitated the filing of the Securities Class Action.  The Securities Class Action names VMware, Gelsinger, and Rowe as defendants and seeks unspecified damages.  VMware, Gelsinger and Rowe are all charged with violations of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC.  Gelsinger and Rowe are also charged with control person violations, pursuant to Section 20(a) of the Exchange Act, and with insider trading violations, pursuant to Section 20A of the Exchange Act.

**C.    Defendants Gelsinger and Rowe Sold Over $41 Million in VMware Stock While in Possession of Material Adverse Non-Public Information**

**1.    Defendant Gelsinger's Insider Stock Sales**

168.    Defendant Gelsinger is the Company's Chief Executive Officer with a highly sophisticated understanding of the Company's financial results and business condition based upon, among other things, his access to proprietary information concerning the Company and reporting relationships with the Company's officers and employees.

169.    As set forth herein, Defendant Gelsinger possessed material adverse information that he knew had not been publicly disclosed.  Gelsinger consciously acted to exploit his knowledge by selling over $23.4 million of VMware stock (over 141,000 shares) at artificially inflated prices while in the possession of material non-public information.  Gelsinger's insider

stock sales were highly suspicious in timing in that they were made close on the heels of the dissemination of false and misleading information regarding VMware's financial condition and business prospects, while VMware's stock price was achieving its highest trading prices, and he made no sales of VMware stock in the 18 month period prior to his first stock sales detailed in the chart below:

| Transaction Date | Price | Shares sold | Proceeds |
|---|---|---|---|
| 9/4/2018 | $152.61 | 11,804 | $1,801,408 |
| 9/4/2018 | $150.69 | 1,602 | $241,405 |
| 9/4/2018 | $151.84 | 11,594 | $1,760,433 |
| 11/7/2018 | $150.00 | 25,000 | $3,750,000 |
| 1/11/2019 | $146.64 | 18,058 | $2,648,025 |
| 1/11/2019 | $147.37 | 9,437 | $1,390,731 |
| 1/11/2019 | $145.56 | 2,600 | $378,456 |
| 3/1/2019 | $180.51 | 1,965 | $354,702 |
| 3/1/2019 | $179.51 | 4,792 | $860,212 |
| 3/1/2019 | $181.61 | 900 | $163,449 |
| 3/1/2019 | $177.62 | 4,452 | $790,764 |
| 3/1/2019 | $176.52 | 1,500 | $264,780 |
| 3/1/2019 | $178.55 | 7,477 | $1,335,018 |
| 5/1/2019 | $204.83 | 5,786 | $1,185,146 |
| 5/1/2019 | $203.85 | 9,113 | $1,857,685 |
| 5/1/2019 | $202.89 | 5,101 | $1,034,942 |
| 7/19/2019 | $180.00 | 20000 | $3,600,000 |
| | | | |
| **Total:** | | 141,181 | $23,417,156 |

170.    Defendant Gelsinger's insider stock sales were also suspicious in amount. Gelsinger made no sales of VMware stock in the 18 month period prior to his first stock sales detailed in the chart above.  Further, the sales represented approximately 25% of his VMware stock holdings.

171.    Defendant Gelsinger thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its financial condition and business prospects.  Gelsinger had the duty to disclose the material adverse information in his possession or abstain from trading in VMware stock, but utterly failed to discharge that duty.

1

**2.    Defendant Rowe's Insider Stock Sales**

2      172.    Defendant Rowe is the Company's Chief Financial Officer with a highly

3  sophisticated understanding of the Company's financial results and business condition based upon,

4  among other things, his access to proprietary information concerning the Company and reporting

5  relationships with the Company's officers and employees.

6      173.    As set forth herein, Defendant Rowe possessed material adverse information that

7  he knew had not been publicly disclosed.  Rowe consciously acted to exploit his knowledge by

8  selling over $17.8 million of VMware stock (over 104,000 shares) at artificially inflated prices

9  while in the possession of material non-public information.  Rowe's insider stock sales were

10 highly suspicious in timing in that they were made close on the heels of the dissemination of false

11 and misleading information regarding VMware's financial condition and business prospects, while

12 VMware's stock price was achieving its highest trading prices, and he made only two transactions,

13 selling a total of only 13,100 shares for $1.76 million in proceeds, in the 18 month period

14 preceding the stock sales detailed in the chart below:

| Transaction Date | Price | Shares sold | Proceeds |
|---|---|---|---|
| 12/12/2018 | $165.08 | 6,500 | $1,073,020 |
| 4/2/2019 | $183.56 | 27,530 | $5,053,407 |
| 4/2/2019 | $182.61 | 17,990 | $3,285,154 |
| 4/2/2019 | $184.26 | 3,110 | $573,049 |
| 6/13/2019 | $175.52 | 7,920 | $1,390,118 |
| 6/13/2019 | $174.86 | 13,208 | $2,309,551 |
| 6/13/2019 | $176.71 | 1,451 | $256,406 |
| 9/5/2019 | $148.18 | 3,656 | $541,746 |
| 9/5/2019 | $148.85 | 2,900 | $431,665 |
| 9/5/2019 | $147.08 | 13,444 | $1,977,344 |
| 12/6/2019 | $148.38 | 6,309 | $936,129 |
| 12/6/2019 | $148.89 | 200 | $29,778 |
| | | | |
| **Total:** | | 104,218 | $17,857,367 |

26

27     174.    Defendants Rowe's insider stock sales were also suspicious in amount.  Rowe had

28 only sold 13,100 VMware shares in the 18 month period prior to his first stock sales detailed in the

chart above.  Further, the sales in the above chart represented approximately 46% of his VMware stock holdings.

175.    Defendant Rowe thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its financial condition and business prospects.  Rowe had the duty to disclose the material adverse information in his possession or abstain from trading in VMware stock, but utterly failed to discharge that duty.

176.    In addition to Defendants Gelsinger and Rowe, during the relevant period, VMware executives sold 702,270 shares of VMware common stock at highly inflated prices, while in possession of material non-public information despite their duty to disclose such information or abstain from trading in the Company's stock.

## VI.    DAMAGES TO THE COMPANY

177.    As a direct and proximate result of the Individual Defendants' conduct, VMware has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

        (a)    Fees for legal and professional services incurred in connection with the Securities Class Action;

        (b)    Costs incurred in connection with the SEC's investigation;

        (c)    Funds expended in connection with the stock repurchases;

        (d)    Any funds paid to settle the Securities Class Action; and

        (e)    Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to VMware.

178.    In addition, VMware's business, goodwill, and reputation with its business partners, regulators, and stockholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

179.    The actions complained of herein have irreparably damaged VMware's corporate image and goodwill.  For at least the foreseeable future, VMware will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in

illegal behavior and have misled the investing public, such that VMware's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

180.    Plaintiffs bring this action derivatively in the right and for the benefit of VMware to redress injuries suffered, and to be suffered, by VMware as a direct result of the Individual Defendants' breaches of fiduciary duty, insider trading, violations of Section 10(b) of the Exchange Act, and unjust enrichment. VMware is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

181.    Plaintiffs will adequately and fairly represent the interests of VMware in enforcing and prosecuting its rights.

182.    Plaintiffs have continuously been shareholders of VMware at times relevant to the wrongdoing complained of and are current VMware shareholders.

183.    When this action was filed, VMware's Board of Directors consisted of nine directors: defendants Gelsinger, Michael Dell, Bates, Marianne Brown, Michael Brown, Carty, Durban, Dykstra, and Sagan. Plaintiffs did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below.

### A.    Defendants Michael Dell and Durban Dominate and Control the Board and VMware

184.    As set forth above, Michael Dell and Durban's Silver Lake are the controlling shareholders of VMware through their control of Dell. Michael Dell owns 91% of Dell's Class A shares, which represent 75.1% of the total vote of all outstanding shares in Dell. Durban and his partners at Silver Lake own 100% of Dell's outstanding Class B shares, which represent 19.9% of the total vote of all outstanding shares in Dell. Together, Michael Dell and Durban through Silver Lake control 95% of the shareholder vote of Dell. Michael Dell and Silver Lake are parties to stockholder agreements through which they together control the composition of Dell's entire Board and its management.

185.    Through Michael Dell's and Durban's control of Dell, they control 27.4% of VMware's Class A shares and 100% of the Company's Class B shares, representing total voting power of 97.4% of VMware's stock.  With this controlling supermajority, Michael Dell and Durban exercise complete control over the composition of VMware's Board, the composition of management, the Company's use of capital, and its strategic decisions.

186.    Michael Dell and Durban, through their control of VMware's Class B stock, have complete control over the election of "Group I" directors.  Eight of the nine current VMware directors are Group I directors elected exclusively by Michael Dell and Durban: Marianne Brown, Michael Brown, Carty, Michael Dell himself, Durban, Dykstra, Gelsinger, and Sagan. Additionally, Michael Dell and Durban completely control the election of Group II directors. Group II directors are elected by Class A and Class B shares voting as a single class, and Michael Dell and Durban control approximately 30.6 million of the 111 million outstanding Class A shares and all 307.2 million outstanding Class B shares.  The single Group II director on the Board is Bates.

**B.    Michael Dell and Silver Lake Fill the VMware Board with Directors Loyal to Them**

187.    Michael Dell and Durban's Silver Lake have used their control over VMware to fill the Board with directors who are not independent of them and with whom they have longstanding business relationships outside of VMware.

188.    According to Dell's proxy statements, the Board has determined that three of the nine current directors are not independent under NYSE and SEC rules: Michael Dell, Durban, and Gelsinger.  The remaining six, purportedly independent directors, Marianne Brown, Michael Brown, Carty, Dykstra, Sagan, and Bates all have a long history of non-VMware relationships with Michael Dell, Durban, and each other.

189.    Defendant Carty has worked for Michael Dell for nearly 30 years.  From 1992 to 2013, Carty was director of Dell's predecessor organizations, Dell Computer Corp. and Dell, Inc. During his 30 years at Dell, Carty earned approximately $2.6 million in compensation as an executive of Dell during 2007 and 2008, and earned approximately *$6.4 million* in director fees

during his tenure as a Dell director.  This more nearly *$10 million* in compensation was exclusively due to Michael Dell's decision to appoint Carty to the Board and hire him as an executive.  At all times, Michael Dell controlled Dell and its predecessor entities.

190.    Defendants Michael Brown, Gelsinger, Carty, and Sagan were all directors at EMC prior to its merger with Dell: Michael Brown from August 2005 to May 2016; Gelsinger from September 2009 to August 2012 (as President and COO); Carty from January 2015 to September 2016; and Sagan from December 2007 to September 2016.  During his tenure on the EMC board, Michael Brown received over $2.7 million in compensation, Gelsinger received $39.8 million, Carty received $456,000, and Sagan received $2.2 million.

191.    Defendants Durban and Bates share a longstanding professional and philanthropic relationship.  From 2012 to 2020, Durban and Bates together sat on the board of directors of Tipping Point, a charity dedicated to fighting poverty in the San Francisco Bay area.  Together, Durban and Bates have donated significant sums of money to Tipping Point.  For example, between 2013 and 2019, Bates donated more than $600,000 and Durban more than $1.35 million to the organization.

192.    Durban and Bates also have a long-standing lucrative business relationship.  Durban's Silver Lake acquired a majority stake of 65% in Skype Global S.à r.l ("Skype") in 2009 in a transaction valued at $2.75 billion.  Under Durban's control, Bates was made CEO of Skype and served in that role from October 2010 to May 2011, when the company was acquired by Microsoft Corporation ("Microsoft"), and stayed on as President of Skype operations at Microsoft, before exiting the company in 2014.  As CEO of Skype during 2010 alone Bates received $19.9 million in compensation.  Meanwhile, when Microsoft acquired Skype it paid $8.5 billion, allowing Silver Lake to more than triple its investment.

193.    Marianne Brown also previously worked for Durban and Silver Lake.  In 2005, Durban and Silver Lake acquired Sungard, a software provider, and formed Sungard Financial Systems.  Marianne Brown was a director and the Chief Operating Officer of Sungard from February 2014 to December 2015 when Sungard Financial Systems was acquired by Fidelity National Information Services, Inc.

194.    Finally, due to Michael Dell's and Silver Lake's decision to appoint them to the VMware Board, each of Marianne Brown, Michael Brown, Carty, Dykstra, Sagan, and Bates earn director fees far in excess of the fees independent directors earn at equivalently sized companies. For example, according to FW Cook's 2019 director compensation survey, median director compensation per year at a large cap company like VMware is $285,000 per year and the 75th percentile of director compensation at a large cap company is $316,000.  As set forth below, the Individual Defendants routinely received well over $400,000 per year in director fees for their service on the VMware Board, and several of them enjoyed multiple years since 2018 in which they received more than $600,000 in director fees.  The Individual Defendants' continued access to this  compensation is reliant exclusively on the goodwill of Michael Dell and Durban, and none of the Individual Defendants would risk their access to it by suing Michael Dell or Durban, or taking action against VMware's Board not supported by Michael Dell and Durban.

**C.    Michael Dell and Silver Lake Benefitted From the Misclassification VMware's Backlog**

195.    Since Dell acquired EMC, and thus control of VMware, in 2016, Michael Dell and Silver Lake have had an interest in VMware that diverges from VMware's minority shareholders: Michael Dell and Durban have repeatedly used their control of VMware to bail out their investments in Dell, which are material to them.

196.    The Dell Class A and Class B common stock owned by Michael Dell and Silver Lake is convertible at any time into Class C common stock on a one-to-one basis.  As of Dell's most recent proxy statement, Michael Dell owned over 350 million shares of Class A and over 1 million shares of Class C common stock, currently worth approximately $23.8 billion.  As of the same proxy statement, Silver Lake owned over 101 million Class B shares, currently worth approximately $6.8 billion.

197.    Since returning to public trading in 2018, Dell has struggled with a high debt load. In 2016 following its acquisition of EMC, Dell reported approximately $56 billion in debt.  As of July 31, 2020, Dell had made little progress on reducing this enormous debt load, reporting $54.5 billion in principal owed.  At all relevant times, Dell's debt load has been roughly equivalent to or

exceeded its market capitalization.  Meanwhile, VMware has at all relevant times had a higher market capitalization and far lower debt.  For example, as of July 31, 2020, VMware had $4.75 billion in debt and a market capitalization of over $60 billion.

198.    As a result, Michael Dell and Silver Lake have looked to VMware to bail out Dell, and by extension, their large investments in Dell.  For example, in 2018 as part of the transaction that resulted in renewed public trading of Dell stock, Michael Dell and Silver Lake orchestrated an $11 billion special distribution from VMware to its stockholders.  Of the $11 billion, nearly $9 billion of the special distribution went to Dell, thereby to Michael Dell and Silver Lake.

199.    As alleged above, in June 2020, media reports revealed that Michael Dell and Silver Lake were again contemplating using VMware to bail out over-leveraged Dell, this time through a spinoff.  As *The Wall Street Journal* reported, the spinoff would be "designed to help reduce Dell's $48 billion debt load."  As the *Journal* explained:

> Dell, founded by Michael Dell in 1984, has become known for its complicated financial engineering over the years. It went private in a 2013 leveraged buyout by Mr. Dell and private-equity firm Silver Lake that was one of the largest on record. After buying EMC, they undertook a complex financial move that returned Dell to the public markets using the shares of a publicly listed vehicle that tracked Dell's stake in VMware. They were ultimately forced to sweeten the deal to fend off resistance from shareholders including activist Carl Icahn.

> Dell shares closed at $49.01 Tuesday, which compares with $45.43 on their first day of trading in late 2018. Dell finance chief Tom Sweet said in a June 15 blog post that the company's priorities include optimizing its capital structure by managing cash flow, paying down debt and making the right investments.

200.    As *CNBC* reported:

> Several of [Dell]'s largest shareholders, including private-equity firm Silver Lake… favor spinning out VMware in September 2021, given the tax efficiencies and simplification to the capital structure, the people said.

> * * *

> One possibility if a spinoff takes place is that VMware could pay [Dell] a large special dividend by taking on added debt and helping Dell reduce its heavy debt load, two of the people said. A similar transaction occurred in 2018, when VMware agreed to pay Dell a special one-time dividend of $11 billion in conjunction with taking Dell public.

201.    As *CNBC* observed, a spin-off of VMware involving a special dividend paid to Michael Dell and Silver Lake would help restore Dell's ability to access credit markets:

> Dell currently has about $45 billion in net debt, while VMware's debt sits at only $3 billion. S&P Global, Moody's and Fitch all rate Dell's corporate credit quality as below investment grade. Dell could achieve investment grade status if it moves forward with the spinoff and associated dividend, two of the people said.[4]

202.    Further supporting Michael Dell's and Silver Lake's need to extract cash from VMware is that the market currently values Dell at approximately $0 excluding the VMware holdings.  VMware has a current market capitalization of approximately $62 billion.  Michael Dell and Silver Lake own approximately 81% of VMware, worth approximately $50.1 billion.  Dell's current market capitalization is $50.2 billion, implying a value of $100 million and over $50 billion debt, excluding the VMware holdings.

203.    For these reasons, Michael Dell and Silver Lake's over $30 billion investment in Dell would be jeopardized if they cannot maintain VMware's stock price by meeting guidance.  If VMware's results or stock price were to fall, Michael Dell and Silver Lake might not be able to access VMware's cash to triage their failing primary investment.  In order to extract those funds, they need two things: (i) VMware continued strong stock performance; and (ii) cooperation from VMware's management and its Board of Directors, specifically including Defendant Gelsinger, who Michael Dell and Silver Lake need to support their spinoff plans.  For the reasons set forth below, Michael Dell and Durban would not be disinterested in a demand to investigate and take action in response to the wrongdoing alleged herein.  Due to interlocking business and personal relationships of the other Individual Defendants, and their reliance on the good will of Michael Dell and Durban for their excessive annual director compensation, the Board will take no action opposed by Michael Dell and Durban.

---

[4]    *Reuters* similarly reported, "[Dell] said it would negotiate payment of a special cash dividend by VMware to all its shareholders …".

1

**D.**     **Demand is Futile as to Count I**

2

_Gelsinger_

3     204.     At all relevant times, Gelsinger was the Company's CEO, and therefore was not

4  independent under NYSE listing rules.  As an employee, Gelsinger derives substantially all of his

5  income from his employment with VMware, thus could not disinterestedly consider a demand for

6  action that might require him to sue the directors that control his continued employment and/or

7  fellow members of management with whom he works on a day-to-day basis.  As alleged herein,

8  Gelsinger sold nearly $23.4 million in VMware stock while in possession of material non-public

9  information regarding the Company's backlog. Gelsinger personally issued the misleading

10 statements alleged herein, and as CEO, he actually knew that the statements were inaccurate.  As a

11 result, Gelsinger would be interested in a demand regarding his own wrongdoing, and demand is

12 futile as to him.

13     205.     Gelsinger likewise will not sue defendant Rowe, his CFO.  First, suing Rowe

14 would effectively be conceding that Gelsinger had also issued misleading statements and should

15 be sued as well.  Second, Gelsinger works day-to-day with his CFO and requires a collaborative

16 relationship to do so.  Were Gelsinger to sue Rowe, he would destroy his working relationship

17 with Rowe and this he will not do.  Third, Gelsinger would not initiate suit against Rowe

18 regarding his improper insider trading since he himself engaged in such improper insider trading

19 and would be effectively conceding his own misconduct.

20     206.     For these reasons demand is futile as to Gelsinger with respect to Count I.

21     _Michael Dell_

22     207.     Michael Dell is the Chairman and controlling shareholder of VMware.  According

23 to the Company's public filings, Michael Dell is not independent under NYSE listing rules or the

24 Company's own guidelines.   According to the Company's filings, Michael Dell "provides

25 guidance to the CEO, sets the agendas for Board meetings and presides over meetings of the full

26 Board."  Michael Dell has long experience as a director and executive and has a sophisticated

27 understanding of accounting and revenue recognition: "Mr. Dell has decades of experience leading

28

a complex, international technology enterprise and possesses extensive knowledge of internet-based technologies and the needs and expectations of enterprise customers."

208.   Michael Dell will not sue Gelsinger because they have a collaborative, day-to-day working relationship that would be destroyed were Dell to sue Gelsinger.  During Michael Dell's control of VMware, Gelsinger has done Michael Dell's bidding to Michael Dell's enormous financial benefit.   For example, in 2018, Michael Dell used his position of control and collaboration with Gelsinger to cause VMware to pay the one-time special dividend of $11 billion to its stockholders, primarily to bail Dell out of debt.  Of the $11 billion paid to the Company's shareholders, nearly $9 billion of it went directly to benefit Michael Dell and Silver Lake through their control position in VMware.  Further, Michael Dell is reliant on Gelsinger's cooperation in order to accomplish the spin off transaction that he is planning for 2021 and which he needs to bail out his over leveraged primary investment in Dell.

209.   Similarly, Michael Dell will not sue Rowe because he has a day-to-day working relationship with his CFO and has provided Rowe with business opportunities outside of VMware. For example, Michael Dell placed Rowe on the Board of Pivotal Software, Inc. ("Pivotal"), a company that he controlled.  Were Michael Dell to acknowledge that Rowe had issued misleading statements, he would be effectively conceding that Gelsinger had, which he will not do.

210.   Michael Dell will not sue Gelsinger and Rowe for their wrongdoing because doing so would harm him and his investments.   First, if Michael Dell were to acknowledge that Gelsinger and Rowe had issued misleading statements that had artificially inflated VMware's financial results, Vmware -- the only portion of Dell that has any value to the market – would be substantially devalued.  Such devaluation would further harm Dell's already poor debt to equity ratio, causing Michael Dell's major primary investment the primary source of his wealth to lose significant value.  Second, if Michael Dell were to acknowledge that executives at VMware had engaged in the wrongdoing alleged, he would be acknowledging that he, as Chairman and controlling shareholder, either knew of the wrongdoing or should have known of the wrongdoing.

211.   Michael Dell further has a history of violating SEC reporting requirements and due to his past settlement with SEC, he would face heightened penalties if he knew or should have

known of the wrongdoing alleged herein.  As summarized above, in 2010, the Securities and Exchange Commission charged Michael Dell and Dell's predecessor, Dell Inc., with failing to disclose material information to investors and using fraudulent accounting to make it falsely appear that the company was consistently meeting Wall Street earnings targets and reducing its operating expenses.  The SEC alleged that Dell effectively used a slush fund to meet previously issued guidance.  Due to his wrongdoing, Michael Dell paid $4 million in penalties and Dell paid $100 million.  The SEC alleged, that Dell "misrepresented the basis for the company's ability to consistently meet or exceed consensus analyst EPS estimates from fiscal year 2002 through fiscal year 2006."  This fraud was accomplished by, among other things, maintaining a series of "cookie jar" reserves that it used to cover shortfalls in operating results from 2002 to 2005.  This fraudulent accounting made it appear that Dell was consistently meeting Wall Street earnings targets and reducing its operating expenses through the company's management and operations.

212.    Due to his 2010 SEC settlement, Michael Dell is subject to an injunction for negligent or more culpable violations of Sections 17(a)(2) and (3) of the Securities Act and Rule 13a-14 under the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 under the Exchange Act.  If Michael Dell were to face further SEC enforcement actions, Durban's collaborations with Michael Dell would be severely harmed, as would his investment in Dell were it proven that the wrongdoing alleged herein occurred while Michael Dell was Chairman of VMware and that he knew, should have known, or negligently did not know of it, he would face SEC action for violating the injunction imposed in his SEC settlement.

213.    For these reasons, demand is futile as to Michael Dell in connection with Count I.

*Durban*

214.    According to VMware's public filings, Durban is not independent under NYSE listing rules or the Company's own guidelines.  As detailed above, Durban is also not independent of Michael Dell.  Durban is the Co-CEO of Silverlake and has a longstanding business relationship with Michael Dell.  Durban and Michael Dell together control Dell and have approximately $30 billion invested in Dell.  Among other things, Durban has been a member of

the boards of directors of Dell and since the closing of Dell Inc.'s going-private transaction in October 2013, which Silver Lake engineered.

215. Durban's business relationship with Michael Dell creates conflicting financial incentives different from those of VMware's public shareholders. Durban and Michael Dell collaborate regularly on non-VMware business ventures. The two served together on the board of Pivotal from 2016 until VMware acquired Pivotal in 2019. Durban and Michael Dell also served together on the board of SecureWorks from 2015 until May 2020, when Durban stepped down from that board.

216. As a result, Durban's financial incentives are the same as Michael Dell's and diverge from VMware's minority shareholders'. Durban will not sue Gelsinger and Rowe for their wrongdoing because doing so would harm Durban's investment in Dell in at least the following ways. First, if Durban were to acknowledge that Gelsinger and Rowe had issued misleading statements that had artificially inflated VMware's financial results, VMware, the only portion of Dell that has any value to the market, would be substantially devalued. Such devaluation would further harm Dell's already poor debt to equity ratio, causing Durban's multi-billion-dollar investment in Dell to lose significant value. Second, if Durban were to acknowledge that executives at VMware had engaged in the wrongdoing alleged, he would tacitly acknowlede that he, a controlling shareholder, either knew of the wrongdoing or should have known of the wrongdoing, *and* that his business partner, Michael Dell, either knew of the wrongdoing or should have known. As described above, Michael Dell is subject to an injunction for negligent or more culpable violations of the Securities Act and Rule 13a-14 under the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 under the Exchange Act. If Michael Dell were to face further SEC enforcement actions, Durban's collaborations with Michael Dell would be severely harmed, as would his investment in Dell.

217. For these reasons, demand is futile as to Durban in connection with Count I.

*Carty*

218. Defendant Carty is not independent of Michael Dell, and would not sue Gelsinger or Rowe as a result. As set forth in ¶ 189 *supra*, Carty has worked for Dell for nearly 30 years and

1  in so doing has earned nearly $10 million, which compensation is material to him.  Carty is not

2  disinterested of Michael Dell and will not take action that is contrary to Dell's financial and

3  reputational interests.  Additionally, Carty has earned over *$995,000* in director fees for his service

4  on the VMware Board in the last three years alone, which amount is material to him.  As a result

5  demand is excused as to Carty in connection with Count I.

6      *Bates*

7      219.    Defendant Bates is not independent of Durban, and would not sue Gelsinger or

8  Rowe as a result.  As set forth in ¶¶ 191-92 *supra*, Bates and Durban have a business and

9  philanthropic relationship unrelated to VMware.  From 2012 through the present, Durban and

10  Bates together sat on the board of directors of Tipping Point.  They together donated nearly $2

11  million to Tipping Point during that time, and attended board functions and benefits together.

12  Additionally, Durban brought Bates in as CEO of Skype for a less than one-year engagement that

13  earned him $19 million in compensation.  Bates is not independent of Durban.  Bates will not take

14  action contrary to Silver Lake's financial and reputational interests.

15      220.    Additionally, Bates has earned over *$1.13 million* in director fees for his service on

16  the VMware Board in the last three years alone, which amount is material to him.  As a result,

17  demand is excused as to Bates in connection with Count I.

18      *Michael Brown and Sagan*

19      221.    Defendants Michael Brown and Sagan were directors at EMC prior to its merger

20  with Dell, during which time they worked closely with defendants Gelsinger and Rowe, who were

21  EMC's President and CFO, respectively. Michael Brown and Sagan served together on EMC's

22  board for seven years and earned $2.7 million, and $2.2 million, respectively, from that

23  engagement.  Michael Brown and Sagan have each earned over $1 million in director fees since

24  Dell acquired EMC, which amounts were material to them.  Sagan has earned over *$1.77 million*

25  in director fees for his service on the VMware Board in the last three years alone, which amount is

26  material to him.  Michael Brown has earned over *$1.35 million* in director fees for his service on

27  the VMware Board in the last three years alone, which amount is material to him.  As a result,

28  they would not be disinterested and independent in a demand to investigate the misconduct of

Gelsinger and Rowe, nor are they independent of Michael Dell and Durban who control their continued service on VMware's Board.  Demand is excused as to Michael Brown and Sagan in connection with Count I.

### *Marianne Brown*

222.    Defendant Marianne Brown is not independent of Michael Dell, Durban or of the other conflicted directors on VMware's Board and cannot act in a disinterested manner.  Durban's Silver Lake hired Marianne Brown as a director and the Chief Operating Officer of Sungard from February 2014 to December 2015 when Sungard Financial Systems was acquired by Fidelity National Information Services, Inc.  While her compensation as COO of Sungard is not publicly disclosed, Plaintiffs believe it to have been material to her as her primary source of employment.  Further, Marianne Brown receives reputational and professional benefits as a result of her position on VMware's Board, in addition to the over $210,000 in director fees she earned in 2019.  Brown will not take any action opposed by Michael Dell or Durban for fear of jeopardizing her position on VMware's Board.  Demand is excused as to Marianne Brown in connection with Count I.

### *Dykstra*

223.    Defendant Dykstra is not independent of Michael Dell and Durban and cannot act in a disinterested manner.  Dykstra has received over *$1.17 million* in director fees in the last three years alone, which amount is material to her.  Dykstra will not take any action opposed by Michael Dell or Durban for fear of jeopardizing her position on VMware's Board and access to the substantial remuneration she receives for serving on it.  Demand is excused as to Dykstra in connection with Count I.

### E.    Demand is Futile as to Count II

### *Gelsinger*

224.    Gelsinger is not an independent director, as set forth above, and he also is not independent of Dell personally.  As controlling shareholder of VMware, Michael Dell controls Gelsinger's continued employment as CEO and access to the enormous compensation that he earns in that role.  In response to a media report in June 2018 that a large competitor was interested in hiring Gelsinger as CEO, Gelsinger stated he was not interested and tweeted "I love

1   being CEO of VMware and not going anywhere else."  In response Michael Dell tweeted an image

2   of him holding a plaque that said of Gelsinger, "you're the best."  Gelsinger will not take any

3   action against Michael Dell that might jeopardize his employment with VMware.

4   225.    Similarly, in their roles as Chairman and CEO, respectively, Michael Dell and

5   Gelsinger work closely together on a day-to-day basis managing the business and affairs of

6   VMware.  Were Gelsinger to vote to sue Michael Dell, he would destroy their collaborative

7   working relationship.

8   226.    Finally, Gelsinger will not vote to sue Michael Dell because doing so would

9   acknowledge that the wrongdoing alleged herein had occurred, and by extension, would

10  acknowledge that Gelsinger either knew or should have known of it.

11  227.    Demand is futile as to Gelsinger in connection with Count II.

12  *Michael Dell*

13  228.    Demand is excused as to Defendant Michael Dell in connection with Count II

14  because he would be interested in an investigation into his own misconduct for the reasons set

15  forth in ¶¶ 184-186, 195-203, 207-212, *supra*.

16  *Durban*

17  229.    Demand is excused as to Defendant Durban in connection with Count II because he

18  would be interested in an investigation into Michael Dell's misconduct and is not independent of

19  Michael Dell for the reasons set forth in ¶¶ 184-186, 195-203, 214-216, *supra*.

20  *Carty*

21  230.    Demand is excused as to Defendant Carty in connection with Count II because he

22  would be interested in an investigation into Michael Dell's misconduct and is not independent of

23  Michael Dell for the reasons set forth in ¶ 189, *supra*, specifically including his 30 year

24  relationship with Michael Dell and the significant financial interest he has in maintaining his

25  current positions on the boards of VMware and Dell.

26  *Bates*

27  231.    Demand is excused as to Defendant Bates in connection with Count II because he

28  would be interested in an investigation into Michael Dell's misconduct and is not independent of

1  Michael Dell and Durban for the reasons set forth in ¶¶ 191-92, 219-20, *supra*, specifically

2  including his longstanding and professional and philanthropic relationship with Durban.

3       *Michael Brown and Sagan*

4       232.    Demand is excused as to Defendants Michael Brown and Sagan in connection with

5  Count II because they would be interested in an investigation into Michael Dell's misconduct and

6  are not independent of Michael Dell and Durban for the reasons set forth in ¶¶ 190, 221, *supra*.

7       *Marianne Brown*

8       233.    Demand is excused as to Defendant Marianne Brown in connection with Count II

9  because she would be interested in an investigation into Michael Dell's misconduct and is not

10  independent of Michael Dell and Durban for the reasons set forth in ¶¶ 193, 222, *supra*.

11       *Dykstra*

12       234.    Demand is excused as to Defendant Dykstra in connection with Count II because

13  she would be interested in an investigation into Michael Dell's misconduct and is not independent

14  of Michael Dell and Durban for the reasons set forth in ¶ 223, *supra*.

15      **F.**    **Demand is Futile as to Count III**

16       *Gelsinger*

17       235.    Demand is excused as to Gelsinger in connection with Count III.  Gelsinger is not

18  independent of Durban, Michael Dell, and the rest of the Board for the reasons set forth in ¶¶ 224-

19  26, *supra*. Additionally, Gelsinger will not vote to sue Bates, Michael Brown, Carty, Durban,

20  Dykstra, and Sagan because doing so would acknowledge that the wrongdoing alleged herein had

21  occurred, and by extension, would acknowledge that Gelsinger and Rowe either knew or should

22  have known of it.

23       *Dell*

24       236.    Demand is excused as to Michael Dell in connection with Count III.  Michael Dell

25  is not independent of Durban for the reasons set forth in ¶¶ 184-86, 195-203, *supra*.  Additionally,

26  Gelsinger will not vote to sue Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan because

27  doing so would acknowledge that the wrongdoing alleged herein had occurred, and by extension,

28

1    would acknowledge that Gelsinger, Rowe and Michael Dell either knew or should have known of

2    it

3           _Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan_

4           237.    Michael Brown, Carty, Dykstra, and Sagan served as the members of the Audit

5    Committee at all relevant times.  As such, they are responsible for the effectiveness of the

6    Company's internal controls, the integrity of its financial statements, and its compliance with laws

7    and regulations.  In their capacities as Audit Committee members, Michael Brown, Carty,

8    Dykstra, and Sagan reviewed and approved the disclosures regarding the Company's financial

9    statements, including with respect to its backlog.  As alleged herein, Michael Brown, Carty,

10   Dykstra, and Sagan failed to ensure the integrity of the Company's internal controls, allowing the

11   materially misleading statements to be disseminated in VMware's SEC filings and other

12   disclosures.  Thus, Michael Brown, Carty, Dykstra, and Sagan breached their fiduciary duties and

13   are not disinterested, and demand is excused as to them.

14          238.    Bates, Michael Brown, and Sagan served as the members of the CCG Committee at

15   all relevant times.  As such, they are responsible for reviewing and approving executive

16   compensation based upon officers' performance with respect to corporate goals, including the

17   Company's financial results.  As alleged herein, Bates, Michael Brown, and Sagan awarded

18   compensation to themselves and officers who made and/or allowed materially misleading

19   statements to be disseminated in VMware's SEC filings and other disclosures.  Thus, Bates,

20   Michael Brown, and Sagan breached their fiduciary duties and are not disinterested, and demand is

21   excused as to them.

22          239.    Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan each are responsible for

23   the issuance of the misleading disclosures and omissions in the 2019 10-K, having signed and

24   issued the 10-K.  When Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan signed the

25   2019 10-K, they knew that the Company was experiencing undisclosed problems with its backlog.

26   By intentionally issuing disclosures that misrepresented the Company's results, Bates, Michael

27   Brown, Carty, Durban, Dykstra, and Sagan breached their fiduciary duties and face a substantial

28   likelihood of liability.

G.    **Demand is Futile as to Count IV**

_Gelsinger_

240.    Gelsinger is a defendant in the Securities Class Action, issued many of the misleading statements detailed herein, and executed the stock sales described above.  As CEO, he actually knew or recklessly disregarded that the statements were inaccurate.  As a result, Gelsinger would be interested in a demand regarding his own wrongdoing, and demand is futile as to him.

241.    Gelsinger likewise will not sue Defendant Rowe, his CFO.  First, suing Rowe would effectively be conceding that Gelsinger had also issued misleading statements and should be sued as well.  Second, Gelsinger works day-to-day with his CFO and requires a collaborative relationship to do so.  Were Gelsinger to sue Rowe, he would destroy his working relationship with Rowe and this he will not do.  Third, Gelsinger would not initiate suit against Rowe regarding his improper insider trading since he himself engaged in such improper insider trading and would be effectively conceding his own misconduct.

242.    Demand is excused as to Gelsinger in connection with Count IV.

_Michael Dell and Durban_

243.    For the reasons set forth in ¶¶ 207-212, _supra_, Michael Dell could not disinterestedly and independently consider a demand to sue Gelsinger or Rowe in connection with his stock sales.  Demand is excused as to Michael Dell on this basis in connection with Count IV.

244.    Durban is not independent of Michael Dell, and also could not disinterestedly and independently consider a demand to sue Gelsinger and Rowe in connection with his stock sales for the reasons set forth in ¶¶ 214-16, _supra_.  Demand is excused as to Michael Dell on this basis in connection with Count IV.

_Carty_

245.    Demand is excused as to Defendant Carty in connection with Count IV because he would be interested in an investigation into Gelsinger and Rowe's misconduct and is not independent of Michael Dell for the reasons set forth in ¶¶ 189, 218, _supra_.

*Bates*

246.     Demand is excused as to Defendant Bates in connection with Count IV because he would be interested in an investigation into Michael Dell's misconduct and is not independent of Michael Dell and Durban for the reasons set forth in ¶¶ 191-92, 219-20, *supra*.

*Michael Brown and Sagan*

247.     Demand is excused as to Defendants Michael Brown and Sagan in connection with Count IV because they would be interested in an investigation into Michael Dell's misconduct and are not independent of Michael Dell and Durban for the reasons set forth in ¶ 221, *supra*.

*Marianne Brown*

248.     Demand is excused as to Defendant Marianne Brown in connection with Count IV because she would be interested in an investigation into Michael Dell's misconduct and is not independent of Michael Dell and Durban for the reasons set forth in ¶ 222, *supra*.

*Dykstra*

249.     Demand is excused as to Defendant Dykstra in connection with Count IV because she would be interested in an investigation into Michael Dell's misconduct and is not independent of Michael Dell and Durban for the reasons set forth in ¶ 223, *supra*.

**H.     Demand is Futile as to Count V**

250.     Plaintiffs reincorporate and reallege the allegations set forth in ¶¶ 204-223 *supra*, in their entireties.  Demand is excused as to Count V for substantially the same reasons that it is excused as to Counts I and IV.

**I.     Demand is Futile as to Count VI**

251.      According to the Company's May 30, 2019 press release, the Board affirmatively authorized the stock repurchase program alleged above.  Defendants Gelsinger, Michael Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan were directors at the time and voted to conduct the stock repurchase.  These defendants therefore by their intentional acts caused the Company to be harmed by over $400 million.  They could not disinterestedly consider a demand for action or investigate their votes without being required to evaluate and make a decision on such topics as their states of mind, and whether there was reason to doubt they acted with business

judgment. This they could not do disinterestedly and independently, and as a result demand is excused.

252. Plaintiffs expressly incorporate and reallege the allegations set forth in ¶¶ 184-223, *supra*, in their entireties. Demand is excused as to Count VI for substantially the same reasons that it is excused as to Counts I, II, III, IV, and V.

### J. Demand is Futile as to Count VII

253. Plaintiffs expressly incorporate and reallege the allegations set forth in ¶¶ 204-223, *supra*, in their entireties. Demand is excused as to Count VII for substantially the same reasons that it is excused as to Counts I, IV, and V.

## COUNT I

### Against Gelsinger and Rowe for Breach of Fiduciary Duty

254. Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

255. Gelsinger and Rowe owe and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of VMware's business and affairs, particularly with respect to issues as fundamental as public disclosures.

256. Gelsinger's and Rowe's conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. Gelsinger and Rowe intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of VMware.

257. In breach of their fiduciary duties owed to VMware, Gelsinger and Rowe willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

258. In particular, Gelsinger and Rowe knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly represent the demand for VMware's products.

259. As a direct and proximate result of Gelsinger and Rowe's breaches of their fiduciary obligations, VMware has sustained and continues to sustain significant damages.

Including direct monetary damages, exposure to liability from the Securities Class Action and the SEC investigation and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, Gelsinger and Rowe are liable to the Company.

**COUNT II**

**Against Michael Dell for Breach of Fiduciary Duty**

260. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

261. Michael Dell owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of VMware's business and affairs, particularly with respect to issues as fundamental as public disclosures.

262. Michael Dell's conduct set forth herein was due to his intentional or reckless breach of the fiduciary duties he owes and owed to the Company. Michael Dell intentionally or recklessly breached or disregarded his fiduciary duties to protect the rights and interests of VMware.

263. In breach of his fiduciary duties owed to VMware, Michael Dell willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering him personally liable to the Company for breaching his fiduciary duties.

264. In particular, Michael Dell knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly represent the demand for VMware's products.

265. As a direct and proximate result of Michael Dell's breaches of his fiduciary obligations, VMware has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from the Securities Class Action and the SEC investigation and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, Michael Dell is liable to the Company

# COUNT III

## Against Michael Brown, Carty, Bates, Sagan, Marianne Brown, and Dykstra
## for Breach of Fiduciary Duty

266.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

267.    Each of Michael Brown, Carty, Bates, Sagan, Marianne Brown, and Dykstra owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of VMware's business and affairs, particularly with respect to issues as fundamental as public disclosures.

268.    Michael Brown, Carty, Bates, Sagan, Marianne Brown, and Dykstra's conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Michael Brown, Carty, Bates, Sagan, Marianne Brown, and Dykstra intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of VMware.

269.    In breach of their fiduciary duties owed to VMware, Michael Brown, Carty, Bates, Sagan, Marianne Brown, and Dykstra willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

270.    In particular, Michael Brown, Carty, Bates, Sagan, Marianne Brown, and Dykstra knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly represent the demand for VMware's products.

271.    As a direct and proximate result of Michael Brown, Carty, Bates, Sagan, Marianne Brown, and Dykstra breaches of their fiduciary obligations, VMware has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from the Securities Class Action and the SEC investigation and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, Michael Brown, Carty, Bates, Sagan, Marianne Brown, and Dykstra are liable to the Company

## COUNT IV

### Against Gelsinger and Rowe – *Brophy* Claim

272.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

273.    As alleged above, Gelsinger and Rowe are fiduciaries of VMware, possessed material, non-public information belonging to VMware, and used that information improperly to profit from sales of VMware stock. When Gelsinger and Rowe directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

274.    When Gelsinger and Rowe sold their VMware stock, they knew that the investing public was unaware of the negative material information that they possessed. They also knew that if the information were disclosed, the market price of VMware stock would be significantly lower. Gelsinger and Rowe timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold. They thereby benefitted by misappropriating VMware's non-public information.

275.    Plaintiffs have no adequate remedy at law.

## COUNT V

### Against Gelsinger and Rowe for Contribution

### for Violations of Sections 10(b) and 21D of the Exchange Act

276.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

277.    Defendants Gelsinger and Rowe are named as defendants in related securities class actions.  The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

278.    VMware is the subject of an SEC investigation and named as a defendant in the Securities Class Action that alleges and asserts claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.  If VMware is found liable for violating the federal securities laws,

the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

279.    As officers, directors and otherwise, Defendants Gelsinger and Rowe had the power or ability to, and did, control or influence, either directly or indirectly, VMware's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

280.    Defendants Gelsinger and Rowe are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

281.    Defendants Gelsinger and Rowe have damaged the Company and are liable to the Company for contribution.

282.    No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

## COUNT VI

**Derivative Claim for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**

**Promulgated Thereunder Against Defendants Gelsinger, Michael Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan**

283.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

284.    This Count is asserted on behalf of the Company against Defendants Gelsinger, Michael Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

285.    At all relevant times, in connection with VMware's repurchases of its shares, Defendants Gelsinger, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan made,

disseminated, or approved false and misleading statements about the Company and that omitted material information specified herein, which he knew or deliberately disregarded were false and misleading or incomplete and were intended to deceive, manipulate, or defraud. Those false and misleading or incomplete statements and Defendants Gelsinger, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan's course of conduct were designed to artificially inflate the price of the Company's common stock.

286. At the same time that the price of the Company's Class A common stock was inflated due to the false and misleading or incomplete statements, Defendants Gelsinger, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan caused the Company to repurchase millions of shares of its own stock at prices that were artificially inflated due to the false and misleading or incomplete statements. Defendants Gelsinger, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan engaged in a scheme to defraud the Company by causing it to repurchase its shares at inflated prices.

287. Defendants Gelsinger, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with the Company's purchases of VMware common stock at all relevant times.

288. Defendants Gelsinger, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made or disseminated various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made or disseminated, in light of the circumstances under which they were made or disseminated, not misleading; made or disseminated the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in

connection with the Company's purchase of VMware Class A common stock, which were intended to, and did deceive the Company regarding its performance and the effectiveness of its internal controls.

289.    Defendants Gelsinger, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan were directors and senior management and of the Company, and were therefore directly responsible for, and are liable for, all materially false and misleading or incomplete statements made at all relevant times, as alleged above.

290.    As described above, Defendants Gelsinger, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan acted with scienter at all relevant times, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth herein were either known to Defendants Gelsinger, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan or were so that they should have been aware of them.

291.    As a result of Defendants Gelsinger, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan's misconduct, VMware has suffered damages in that it paid artificially inflated prices for VMware Class A common stock as part of the repurchase program and suffered losses when the true facts became known. The Company would not have purchased VMware Class A common stock at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by Defendants Gelsinger, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan's false and misleading or incomplete statements.

292.    As a direct and proximate result of Defendants Gelsinger, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan's wrongful conduct, the Company suffered damages in connection with its repurchases of VMware Class A common stock during the relevant period. By reason of such conduct, Defendants Gelsinger, Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

293.    Plaintiffs brought this claim within two years of their discovery of the facts constituting the violation and within five years of the violation.

## COUNT VII

### Against Gelsinger and Rowe for Unjust Enrichment

294.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

295.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of VMware.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to VMware.

296.   Plaintiffs, as stockholders and representatives of VMware, seek restitution from these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

297.   Plaintiffs, on behalf of VMware, have no adequate remedy at law

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of VMware, demand judgment as follows:

A.   Declaring that Plaintiffs may maintain this action on behalf of VMware and that Plaintiffs are adequate representatives of the Company;

B.   Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties, insider trading, violations of the securities laws, and unjust enrichment;

C.   Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to VMware

D.   Directing VMware to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect VMware and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1    1.   a proposal to implement and maintain an effective system of internal controls over

2  the Company's financial reporting;

3    2.   a proposal to strengthen the Board's supervision of operations and develop and

4  implement procedures for greater stockholder input into the policies and guidelines of the Board;

5    3.   a proposal to strengthen VMware's oversight of its disclosure procedures;

6    4.   a provision to control insider transactions; and

7    5.   a provision to permit the stockholders of VMware to nominate at least three

8  candidates for election to the Board;

9    E.   Extraordinary equitable and/or injunctive relief as permitted by law, equity, and

10  state statutory provisions sued hereunder, including attaching, impounding, imposing a

11  constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their

12  other assets so as to assure that Plaintiffs on behalf of VMware have an effective remedy;

13    F.   Awarding to VMware restitution from Defendants, and each of them, and ordering

14  disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

15    G.   Awarding to Plaintiffs the costs and disbursements of the action, including

16  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

17    H.   Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

19  Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

1   DATED: October 16, 2020             **GLANCY PRONGAY & MURRAY LLP**

2                                       By:   *s/ Robert V. Prongay*
                                        _____
3                                       Robert V. Prongay
                                        Pavithra Rajesh
4                                       1925 Century Park East, Suite 2100
                                        Los Angeles, CA 90067
5                                       Telephone:  (310) 201-9150
                                        Facsimile:  (310) 201-9160
6                                       Email: rprongay@glancylaw.com
                                               prajesh@glancylaw.com
7

8                                       Benjamin I. Sachs-Michaels (*pro hac vice* to be filed)
                                        Daniella Quitt
9                                       712 Fifth Avenue
                                        New York, NY 10019
10                                      Telephone: (212) 935-7400
                                        Facsimile: (212) 756-3630
11                                      Email: bsachsmichaels@glancylaw.com
                                               dquitt@glancylaw.com
12

13                                      **WEISSLAW LLP**
                                        David C. Katz (*pro hac vice*)
14                                      Mark D. Smilow (*pro hac vice*)
                                        Joshua M. Rubin (*pro hac vice* to be filed)
15                                      1500 Broadway
                                        New York, NY 10036
16                                      Telephone: (212) 682-3025
                                        Facsimile: (212) 682-3010
17                                      Email: dkatz@weisslawllp.com
                                               msmilow@weisslawllp.com
18                                             jrubin@weisslawllp.com
19

20                                      *Co-Lead Counsel for Plaintiffs*

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On October 16, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 16, 2020, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay