1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

SAN JOSE DIVISION

7
8
9

IN RE VMWARE, INC. STOCKHOLDER
DERIVATIVE LITIGATION

Case No.   5:20-cv-03079-EJD

**ORDER GRANTING MOTION TO
DISMISS**

Re: Dkt. No. 54

10
11
12
13
14

    Plaintiffs Booth Family Trust, Hugues Gervat, and Stacie Williams ("Plaintiffs") filed this

15

shareholder derivative action for the benefit of Nominal Defendant VMware, Inc. ("VMware")

16

against certain members of VMware's board of directors and executive officers (collectively,

17

"Individual Defendants"), alleging claims for breach of fiduciary duties, insider trading, violation

18

of §§ 10(b) and 21D of the Securities and Exchange Act of 1934 (the "Exchange Act") and

19

Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, and unjust

20

enrichment.  Am. Compl., Dkt. No. 49.  Presently before the Court is Defendants' Motion to

21

Dismiss Plaintiffs' Amended Shareholder Derivative Complaint pursuant to Federal Rules of Civil

22

Procedure 12(b)(6), 9(b), and 23.1, Delaware Court of Chancery Rule 23.1, and the Private

23

Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, based on (i) failure to

24

make a pre-litigation demand and (ii) failure to state a claim.  Mot. to Dismiss ("Mot."), Dkt. No.

25

54.

26

    The Court finds this matter suitable for decision without oral argument pursuant to Civil

27

Local Rule 7-1(b).  Having reviewed the parties' submissions, the Court GRANTS Defendants'

28

Case No.: 5:20-cv-03079-EJD
ORDER GRANTING MOTION TO DISMISS
1

United States District Court
Northern District of California

1  motion to dismiss with leave to amend.

2  **I.    BACKGROUND**

3      **A.    Factual Background[1]**

4          **1.    Overview**

5  Plaintiffs are current shareholders of VMware, a software company.  Am. Compl. ¶¶ 1, 12-

6  14.  VMware derives revenue primarily from licensing its software under perpetual licenses or

7  consumption-based contracts and the related service revenue, consisting of software maintenance

8  and support, training, consulting services and host services.  *Id*. ¶ 35.  VMware is an indirectly-

9  held, majority-owned subsidiary of Dell Technologies Inc. ("Dell").  *Id*. ¶ 37.

10     The Individual Defendants are members of VMware's board of directors and executive

11  officers of VMware: Patrick P. Gelsinger (Chief Executive Officer and director), Zane Rowe

12  (Chief Financial Officer), Michael Dell (Chairman of the Board of Directors), Anthony Bates

13  (director and member of Compensation and Corporate Governance Committee), Marianne Brown

14  (director and member of Audit Committee), Michael Brown (director, chair of Audit Committee,

15  and member of Compensation and Corporate Governance Committee), Donald Carty (director and

16  member of Audit Committee), Egon Durban (director), Karen Dykstra (director and member of

17  Audit Committee), and Paul Sagan (director and member of Audit Committee).  *Id*. ¶¶ 7, 16-26.

18     The gravamen of Plaintiffs' allegations is that between 2018 and 2020, Defendants

19  engaged in improper earnings management by manipulating VMware's backlog[2] in order to

20  present a false or misleading image of VMware's financial success and future growth.  *See, e.g.*,

21  *id*. ¶¶ 46, 56-57.  Plaintiffs allege that Defendants manipulated the backlog to "smooth" reported

22  revenue for the purposes of meeting financial expectations and increasing compensation for

23  _____

24  [1] On a motion to dismiss, the Court accepts as true all well-pled factual allegations and construes
    them in the light most favorable to the plaintiff.  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d

25  681, 690 (9th Cir. 2011).

26  [2] "Backlog" consists of "unfulfilled purchase orders or unfulfilled executed agreements at the end
    of a given period"—i.e., "[d]eals that were made in one quarter, but that the Company expected to

27  deliver and recognize in revenue the next quarter . . . ."  *Id*. ¶¶ 2, 48.

28  Case No.: 5:20-cv-03079-EJD
    ORDER GRANTING MOTION TO DISMISS
                    2

United States District Court
Northern District of California

1    VMware officers and directors through bonus compensation and insider sales at artificially

2    inflated stock prices.  *Id.*  The SEC ultimately initiated an investigation into VMware's backlog

3    practices in December 2019.  *Id.* ¶¶ 3, 160-167.

4         Plaintiffs further allege that Defendants made or caused to be made public statements or

5    statements in SEC filings that were false or misleading in that "they failed to disclose: (i) that

6    [VMware's] accounting and disclosures, including with respect to its backlog, did not comply with

7    applicable accounting principles and disclosure regulations; and (ii) that, as a result, [VMware]

8    was reasonably likely to incur regular scrutiny, and lawsuits."  *Id.* ¶¶ 49-56, 86.  Plaintiffs provide

9    a detailed accounting of specific statements Defendants made between August 23, 2018, when

10   Defendants released the quarterly report for Q2 2019, and February 27, 2020, when they released

11   the quarterly report for Q4 2020.  *Id.* ¶¶ 80-159.

12        Moreover, Plaintiffs allege Defendants' series of false/misleading statements coincided

13   with improper stock sales by certain Individual Defendants, VMware's repurchase of

14   approximately 7.66 million shares of its own common stock at artificially inflated prices for $1.33

15   billion, and, ultimately, a sharp decline in VMware stock prices.  *Id.* ¶¶ 5, 164, 168-176.  Plaintiffs

16   say Defendants' actions have resulted in harm to VMware, including costs connected to a related

17   securities class action suit against VMware, costs related to the SEC's investigation, costs

18   associated with stock repurchasing, and costs associated with harm to VMware's business,

19   goodwill, and reputation.  *Id.* ¶¶ 177-179.

20              **2.     Defendants' allegedly misleading statements and failures to disclose**

21        Plaintiffs allege that Defendants made numerous misleading statements in VMware's SEC

22   filings between Q2 2019 and Q4 2020.  *Id.* ¶¶ 80-159.  For example, Plaintiffs allege that on

23   August 23, 2018, Defendants caused VMware to file with the SEC a Form 8-K with an attached

24   press release as a report for the second quarter of FY 2019.  *Id.* ¶ 80.  In the filing, VMware

25   reported "revenue for the quarter of $2.17 billion, an increase of 13% from the second quarter of

26   fiscal 2018; GAAP (Generally Accepted Accounting Principles) operating income for the quarter

27   of $509 million, an increase of 20% from the second quarter of fiscal 2018; and license revenue

28   Case No.: 5:20-cv-03079-EJD
     ORDER GRANTING MOTION TO DISMISS
                                    3

United States District Court
Northern District of California

for the quarter of $900 million, and an increase of 15% from the second quarter of fiscal 2019." *Id*. The press release included the following quoted statement from Gelsinger: "Q2 was another strong quarter as we continue to see good momentum across our product and services portfolio in every region." *Id*. ¶ 81. The press release also quoted Rowe: "Our results in Q2 were driven by successful execution of our strategy and strong operational performance across the business. Product license bookings grew double-digits year-over-year in all major product categories." *Id*.; *see also* ¶¶ 84-85, 87-88, 94-95, 97, 104-105, 118-119, 129-131, 135-136, 141-144, 146-148, 155-158, 161, 166. Plaintiffs assert that these statements and other similar statements were misleading because they failed to properly disclose "(i) that [VMware's] accounting and disclosures, including with respect to its backlog, did not comply with applicable accounting principles and disclosure regulations; and (ii) that, as a result, [VMware] was reasonably likely to incur regulatory scrutiny, and lawsuits." *Id*. ¶¶ 86, 96, 106, 117, 132, 145, 159.

Plaintiffs also cite as misleading statements Gelsinger's and Rowe's repeated positive statements during quarterly phone calls with shareholders and financial analysts. For example, Plaintiffs allege that during a August 23, 2018 VMware conference call with financial analysts, Rowe stated that "VMware's license backlog in the quarter was $141 million, well above the $122 million license backlog reported at the end of [VMware's] first quarter." *Id*. ¶ 82. Plaintiffs further allege that Gelsinger stated the following:

> [W]e believe we are in a strong cycle. Customers are resonating with the VMware strategy. Our execution is good and the market for technology is strong. And those are not this quarter statements. Those are long-term statements where we think that the business performance, our growth rates, the ability of customers to invest in the strategic product portfolio that we have. These are long-term trends and we believe that we're in a very good cycle for the business for not just this quarter, but well into the future.

*Id*. ¶ 83; *see also* ¶¶ 89-93, 98-101, 120-126, 137-140, 149-154, 166.

Plaintiffs cite various financial analyst reports commenting on VMware's quarterly results and VMware's backlog. *See, e.g.*, *id*. ¶¶ 133-134 (citing Deutsche Bank Research report stating that, when asked about "the steep decline in the license backlog reported last quarter," Rowe

United States District Court
Northern District of California

1    responded with, "[D]eal timing").  Plaintiffs appear to suggest these reports further indicated that

2    Defendants' statements were false and/or misleading.  *See, e.g.*, ¶ 132.

3        Plaintiffs also cite a proxy statement that Defendants allegedly caused VMware to issue on

4    May 13, 2019.  *Id.* ¶¶ 107-117.  Plaintiffs assert that this statement was also false and misleading

5    because it "(i) misrepresented the accuracy of VMware's financial statements, including with

6    respect to backlog; (ii) it misrepresented the Board's actual activities with respect to risk

7    management while soliciting votes to reelect and compensate directors who were breaching their

8    fiduciary duties and engaging in other misconduct; and (iii) it failed to disclose that each of the

9    non-employee directors were interested in their own grants of discretionary compensation."  *Id.* ¶

10   117.

### 3.    Gelsinger's and Rowe's stock sales

12       Plaintiffs allege that between September 4, 2019 and July 19, 2019, Gelsinger sold 141,181

13   VMware shares for a total of $23,417,156.  *Id.* ¶¶ 168-171.  Plaintiffs believe that these sales were

14   suspicious because Gelsinger possessed material non-public information and sold the shares

15   during a period of time when VMware stock prices were high.  *Id.*  Gelsinger did not make any

16   stock sales in the 18 months prior to September 4, 2019.  *Id.*

17       Additionally, Plaintiffs allege that between December 12, 2018 and December 6, 2019,

18   Rowe sold 104,218 VMware shares for a total of $17,857,367.  *Id.* ¶¶ 172-176.  Plaintiffs say that

19   these sales were suspicious because Rowe possessed non-public information and sold the shares

20   during a period of time when VMware stock prices were high.  *Id.*  Rowe made two stock sales in

21   the 18 months prior to December 12, 2018.  *Id.*

22       Plaintiffs further allege that during the relevant period, "VMware executives sold 702,270

23   shares of VMware common stock at highly inflated prices, while in possession of material non-

24   public information."  *Id.* ¶ 176.

### B.    Procedural Background

26       On March 31, 2020, VMware shareholders filed a class action complaint asserting

27   securities fraud against VMware, *Lamartina v. VMware, Inc., et al.*, No. 5:20-cv-02182-EJD

1    (N.D. Cal.) ("the Securities Class Action").

2    　　　On May 5, 2020, Plaintiffs filed this derivative action.  Dkt. No. 1.  On October 16, 2020,

3    Plaintiffs filed the operative Amended Shareholder Derivative Complaint asserting the following

4    claims: (1) breach of fiduciary duty against Gelsinger and Rowe; (2) breach of fiduciary duty

5    against Michael Dell; (3) breach of fiduciary duty against Michael Brown, Carty, Bates, Sagan,

6    Marianne Brown, and Dykstra; (4) insider trading (i.e., *Brophy* claim) against Gelsinger and

7    Rowe; (5) contribution for violation of Sections 10(b) and 21D of the Exchange Act against

8    Gelsinger and Rowe; (6) derivative claim for violations of §10(b) of the Exchange Act and SEC

9    Rule 10b-5 against Gelsinger, Michael Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and

10   Sagan; and (7) unjust enrichment against Gelsinger and Rowe.  Am. Compl., Dkt. No. 49.  On

11   December 2, 2020, Defendants moved to dismiss the complaint now before the Court.  Mot., Dkt.

12   No. 54.

13   **II.　　LEGAL STANDARD**

14   　　**A.　　Federal Rules of Civil Procedure 12(b)(6) and 9(b)**

15   　　　Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient

16   specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which

17   it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).  A

18   complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim

19   upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Dismissal of a claim under Rule

20   12(b)(6) may be based on a "lack of a cognizable legal theory or the absence of sufficient facts

21   alleged under a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d

22   1097, 1104 (9th Cir. 2008); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

23   Moreover, the factual allegations "must be enough to raise a right to relief above the speculative

24   level" such that the claim "is plausible on its face."  *Twombly*, 550 U.S. at 556–57.

25   　　　At the motion to dismiss stage, the Court must read and construe the complaint in the light

26   most favorable to the non-moving party.  *Reese*, 643 F.3d at 690.  The Court must accept as true

27   all "well-pleaded factual allegations."  *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).  However,

28   Case No.: 5:20-cv-03079-EJD
     ORDER GRANTING MOTION TO DISMISS

United States District Court
Northern District of California

1    "courts are not bound to accept as true a legal conclusion couched as a factual allegation."

2    *Twombly*, 550 U.S. at 555.  "In all cases, evaluating a complaint's plausibility is a context-specific

3    endeavor that requires courts to draw on . . . judicial experience and common sense."  *Levitt v.*

4    *Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th

5    Cir. 2011)) (internal quotation marks omitted).

6         In addition to Rule 8's requirements, fraud cases are also governed by the heightened

7    pleading standard of Rule 9(b).  A plaintiff averring fraud or mistake must plead with particularity

8    the circumstances constituting fraud, but malice, intent, knowledge and other conditions of the

9    mind may be averred generally.  *See* Fed. R. Civ. P. 9(b).  Particularity under Rule 9(b) requires

10   the plaintiff to plead the "who, what, when, where, and how" of the misconduct alleged.  *Kearns v.*

11   *Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Vess v. Ciba-Geigy Corp. USA*,

12   317 F.3d 1097, 1106 (9th Cir. 2003)).  Securities fraud claims must also satisfy the pleading

13   requirements of the PSLRA, which states that the complaint "shall specify each statement alleged

14   to have been misleading, the reason or reasons why the statement is misleading, and, if an

15   allegation regarding the statement or omission is made on information and belief, the complaint

16   shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

17   The PSLRA also requires a plaintiff to state with particularity facts giving rise to a strong

18   inference of a defendant's scienter.  *See id.* § 78u-4(b)(2).

19        When deciding whether to grant a motion to dismiss, the Court generally "may not

20   consider material outside the pleadings."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998

21   (9th Cir. 2018).  However, the Court may consider material submitted as part of the complaint or

22   relied upon in the complaint, and it may also consider material subject to judicial notice.  *See id*.

23   In the event that a motion to dismiss is granted, "a district court should grant leave to amend even

24   if no request to amend the pleading was made, unless it determines that the pleading could not

25   possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.

26   2000) (internal quotation marks omitted).

27

28   Case No.: 5:20-cv-03079-EJD
     ORDER GRANTING MOTION TO DISMISS
                                        7

United States District Court
Northern District of California

United States District Court
Northern District of California

### B.    Federal Rule of Civil Procedure 23.1

"A derivative action is an extraordinary process where courts permit 'a shareholder to step into the corporation's shoes and to seek in its right the restitution he could not demand in his own.'" *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2010) (quoting *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir. 1983)).  "Accordingly, strict compliance with [Federal Rule of Civil Procedure] 23.1 and the applicable substantive law is necessary before a derivative suit can wrest control of an issue from the board of directors."  *Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008).  Rule 23.1 imposes a "heightened pleading standard."  *La. Mun. Police Emps.' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1058 (9th Cir. 2016).  Part of the heightened standard is the requirement to plead "demand futility" with particularity: that is, to "state with particularity . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and [] the reasons for not obtaining the action or not making the effort."  *Towers v. Iger*, 912 F.3d 523, 528 (9th Cir. 2018) (quoting Fed. R. Civ. P. 23.1(b)(3)) (internal quotation marks omitted).  "The substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief."  *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (quoting *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004)).

## III.    DISCUSSION

Defendants contend that the Court should dismiss the complaint for two reasons: (1) Plaintiffs did not make the requisite pre-suit demand on VMware's board of directors before filing this derivative action and do not adequately plead demand futility, and (2) Plaintiffs fail to state a claim under Rule 12(b)(6).  Mot. at 1–4.

### A.    Demand Futility

The parties' primary dispute concerns the threshold issue of whether Plaintiffs were required to make a demand on VMware's board of directors before filing this action.  Under Rule 23.1, "a shareholder must either demand action from the corporation's directors before filing a shareholder derivative suit, or plead with particularity the reasons why such demand would have

Case No.: 5:20-cv-03079-EJD
ORDER GRANTING MOTION TO DISMISS

8

1    been futile." *Arduini v. Hart*, 774 F.3d 622, 628 (9th Cir. 2014); *see also* Fed. R. Civ. P.

2    23.1(b)(3); *In re Facebook, Inc. S'holder Deriv. Privacy Litig.*, 367 F. Supp. 3d 1108, 1123 (N.D.

3    Cal. 2019).  "The purpose of this demand requirement in a derivative suit is to implement the basic

4    principle of corporate governance that the decisions of a corporation—including the decision to

5    initiate litigation—should be made by the board of directors or the majority of shareholders."

6    *Rosenbloom*, 765 F.3d at 1148 (internal quotations omitted).

7        Here, Plaintiffs allege that such a demand would have been futile.  Am. Compl. ¶¶ 7, 183-

8    253.  Because VMware is a Delaware corporation, Delaware law applies.  Am. Compl. ¶ 15;

9    *Tindall v. First Solar Inc.*, 892 F.3d 1043, 1056 (9th Cir. 2018) ("The law of the state of

10   incorporation governs whether demand is futile.").

11       Under Delaware law, "a shareholder who declines to make a demand on the board of

12   directors may not bring a derivative action until he has demonstrated, with particularity, the

13   reasons why pre-suit demand would be futile."  *Rosenbloom*, 765 F.3d at 1148 (internal quotations

14   omitted).  Demand futility "is gauged by the circumstances existing at the commencement of a

15   derivative suit and concerns the board of directors sitting at the time the complaint is

16   filed."  *Id.* (internal quotations omitted).  The Court must determine futility on a case-by-case

17   basis, and "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the

18   particularized facts alleged."  *Id.*  However, "conclusory allegations are not considered as

19   expressly pleaded facts or factual inferences."  *Id.*

20       Delaware has two tests for demand futility: the *Aronson* test and the *Rales* test.[3]  *Tindall*,

21

22   [3] On September 23, 2021, the Delaware Supreme Court issued an opinion recognizing difficulties
     in applying *Aronson* and refining the test for demand futility.  *United Food and Com. Workers*

23   *Union and Participating Food Indus. Emp'rs Tri-State Pension Fund v. Zuckerberg*, --- A.3d ---,
     2021 WL 4344361, at *15–17 (Del. 2021) ("It is no longer necessary to determine whether the

24   *Aronson* test or the *Rales* test governs a complaint's demand-futility allegations.").  The refined
     three-part test requires a court to examine on a director-by-director basis:

25
        (i) whether the director received a material personal benefit from the
26      alleged misconduct that is the subject of the litigation demand;

27      (ii) whether the director would face a substantial likelihood of
        liability on any of the claims that are the subject of the litigation

28   Case No.: 5:20-cv-03079-EJD
     ORDER GRANTING MOTION TO DISMISS

United States District Court
Northern District of California

892 F.3d at 1046 (citing *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008)).  The *Aronson* test,

pursuant to *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), "requires that the plaintiff allege

particularized facts creating a reason to doubt that (1) the directors are disinterested and

independent or that (2) the challenged transaction was otherwise the product of a valid exercise of

business judgment." *Tindall*, 892 F.3d at 1046 (internal quotation marks omitted).  If either prong

of the *Aronson* test is satisfied, demand is excused.  *Rosenbloom*, 765 F.3d at 1148.  The *Aronson*

test applies only where a plaintiff challenges the board's business decisions.  *Tindall*, 892 F.3d at

1046.  Where the subject of the derivative suit is not a business decision of the board, the test

under *Rales v. Blasband*, 634 A.2d 927 (Del. 1993) applies.  *Id.*  The *Rales* test examines "whether

or not the particularized factual allegations of a derivative stockholder complaint create a

reasonable doubt that, as of the time the complaint is filed, the board of directors could have

properly exercised its independent and disinterested business judgment in responding to a

demand."  634 A.2d at 934.

The difference between the *Aronson* and *Rales* tests may be blurred in cases in which

personal liability for breach of fiduciary duties implicates the board's availment of business

judgment protections.  *Rosenbloom*, 765 F.3d at 1150.  Here, Defendants assert that the *Rales* test

applies to Plaintiffs' claims concerning breach of fiduciary duty and misleading statements and

that the *Aronson* test applies to Plaintiffs' claims based on the decision to repurchase VMware

stock.  Mot. at 9.  Plaintiffs' opposition brief does not distinguish between the tests or their claims

and therefore does not appear to dispute that contention.  *See* Opp'n at 10, 24.  Under either test,

---

demand; and

(iii) whether the director lacks independence from someone who
received a material personal benefit from the alleged misconduct
that is the subject of the litigation demand or who would face a
substantial likelihood of liability on any of the claims that are the
subject of the litigation demand.

*Id.* at *17.  As of the date of this order, the *United Food* opinion has not been released for
publication in permanent law reports and remains subject to revision or withdrawal.  The Court's
analysis here follows this updated three-part inquiry in substance, if not strict form.

Case No.: 5:20-cv-03079-EJD
ORDER GRANTING MOTION TO DISMISS

United States District Court
Northern District of California

1    "demand is excused if Plaintiffs' particularized allegations create a reasonable doubt as to whether

2    a majority of the board of directors faces a substantial likelihood of personal liability for breaching

3    the duty of loyalty." *Rosenbloom*, 765 F.3d at 1150; *see also In re Facebook*, 367 F. Supp. 3d at

4    1123 n.5 (following *Rosenbloom*'s approach where plaintiff alleged both action and inaction by

5    the board of directors); *In re Rocket Fuel Inc.*, No. 15-cv-04625-PJH, 2016 WL 4492582, at *3

6    (N.D. Cal. Aug. 26, 2016) ("The *Rales* test and the first prong of the *Aronson* test are the same –

7    the court looks at whether the plaintiff has established, by means of particularized factual

8    allegations, that a majority of the board is interested or is lacking in independence."). Directors

9    breach the duty of loyalty where they "fail to act in the face of a known duty to act, thereby

10   demonstrating a conscious disregard for their responsibilities [and] failing to discharge [the non-

11   exculpable fiduciary duty of loyalty] in good faith." *Id.* (internal quotation marks omitted).

12       Furthermore, where "directors are contractually or otherwise exculpated from liability for

13   certain conduct, then a serious threat of liability may only be found to exist if the plaintiff pleads a

14   non-exculpated claim against the directors based on particularized facts." *In re Facebook*, 367 F.

15   Supp. 3d at 1124 (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)) (internal quotation

16   marks omitted). VMware's certificate of incorporation exculpates its directors from personal

17   liability for breaches of fiduciary duty within the limits of Delaware law.[4] Thus, Plaintiffs must

18   "plead particularized facts that demonstrate that the directors acted with scienter, i.e., that they had

19   actual or constructive knowledge that their conduct was legally improper." *Wood*, 953 A.2d at

20   141; *see In re Facebook*, 367 F. Supp. 3d at 1124.

21       VMware's board is comprised of nine directors: Gelsinger, Bates, Marianne Brown,

22   Michael Brown, Carty, Michael Dell, Durban, Dykstra, and Sagan. Am. Compl. ¶¶ 7, 16-26.

23

24   [4] Defendants cite to VMware's Amended and Restated Certificate of Incorporation, executed June
     8, 2017, as it appears on VMware's website. Mot. at 16 n.6 (citing to Amended and

25   Restated Certificate of Incorporation of VMware, Inc., Article X, available at
     https://ir.vmware.com/download/companies/vmware/CorporateGovernance/VMW-COI-

26   6.13.17.pdf). Defendants did not request the Court take judicial notice of that document.
     However, Plaintiffs appear not to object to the Court's consideration of the document, as they do

27   not directly respond to this argument and thus appear to concede it.

28   Case No.: 5:20-cv-03079-EJD
     ORDER GRANTING MOTION TO DISMISS
     11

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Demand would be excused as futile if there is a reason to doubt that five of the nine directors are

2   unable to disinterestedly or independently consider a demand.  *See Aronson*, 473 A.2d at 814-15;

3   *Rosenbloom*, 765 F.3d at 1148.  Plaintiffs argue that demand is futile here because they have

4   adequately pled that: (1) Gelsinger, Michael Dell, and Durban are not disinterested[5]; (2) Gelsinger,

5   Michael Dell, Durban, Carty, Bates, Michael Brown, Sagan, and Marianne Brown are not

6   independent of Gelsinger, Michael Dell, and Durban; and (3) Individual Defendants face a

7   substantial likelihood of liability on the claims against them.  Opp'n at 10–25.

8                   **1.       Interestedness**

9           To show that a director is "interested," the plaintiff must plead (a) particularized facts

10   showing that the director faces a substantial likelihood of liability on any of the claims that are the

11   subject of the litigation, or (b) particularized facts showing that the director received a personal

12   benefit from the wrongdoing that was not equally shared with the stockholders.  *See United Food*

13   *and Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 887, 889 (Del. Ch. 2020); *see also*

14   *Rosenbloom*, 765 F.3d at 1149 ("[A] director's interest may be shown by demonstrating a

15   potential personal benefit or detriment to the director as a result of the decision."); *Aronson*, 473

16   A.2d at 814 (directors are considered interested if they either "appear on both sides of a

17   transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing,

18   as opposed to a benefit which devolves upon the corporation or all stockholders generally").

19           To adequately plead that a director has a disqualifying interest based on corporate inaction,

20   Plaintiffs must plead that a "majority of the Board had actual or constructive knowledge of

21   violations of the law at [the corporation] involving [the alleged illegal conduct] and did nothing."

22   *Rosenbloom*, 765 F.3d at 1151.  This claim "essentially turns on whether Plaintiffs have

23   adequately alleged scienter."  *Id.*  As to what constitutes a red flag, evidence of illegality is the

24   "proverbial red flag."  *South v. Baker*, 62 A.3d 1, 15 (Del. 2012).  "Under Delaware law, red flags

25

26   _____

27   [5] Plaintiffs also assert that Rowe is interested, Opp'n at 10–11, but because he is not a director, the
     Court does not include him in the futility analysis.

28   Case No.: 5:20-cv-03079-EJD
     ORDER GRANTING MOTION TO DISMISS
                                            12

'are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer.'" *Wood*, 953 A.2d at 143 (citation omitted). The "corporate trauma" must be "sufficiently similar to the misconduct implied by the 'red flags,' such that the board's bad faith, 'conscious inaction' proximately caused the trauma." *Melbourne Mun. Firefighters' Pension Tr. Fund on Behalf of Qualcomm, Inc. v. Jacobs*, No. 10872-VCMR, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016), *aff'd*, 158 A.3d 449 (Del. 2017).

Plaintiffs assert that Gelsinger, Michael Dell, and Durban are interested because they received a personal benefit from the wrongdoing—i.e., the manipulated backlog and resulting rise in stock price—that other stockholders did not share. Opp'n at 10–14. The parties also dispute whether there is a substantial likelihood that Defendants will be found liable for each of the asserted claims. *Id.* at 19–25; Mot. at 16–21.

### a.  Gelsinger

First, Plaintiffs argue that Gelsinger is interested because he "personally led [VMware]'s day-to-day operations, signed the Company's quarterly and annual reports filed with the SEC, and spoke to investors during earnings calls." Opp'n at 11. However, the Amended Complaint lacks specific allegations concerning Gelsinger's purported leadership of "day-to-day operations." Plaintiffs plead only generally that he is the CEO "with a highly sophisticated understanding of the Company's financial results and business condition based upon, among other things, his access to proprietary information concerning the Company and reporting relationships with the Company's officers and employee" and that he works with the other Individual Defendants on a day-to-day basis. Am. Compl. ¶¶ 168, 205.

Plaintiffs further argue that Gelsinger's stock sales suggest that he was aware that he was issuing misleading statements. Opp'n at 11. In the context of securities fraud, only "unusual" or "suspicious" stock sales by corporate insiders that are dramatically out of line with prior trading practices at times calculated to maximize personal benefit may support a strong inference of scienter in the Ninth Circuit. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066–67 (9th Cir. 2008).

Case No.: 5:20-cv-03079-EJD
ORDER GRANTING MOTION TO DISMISS
13

United States District Court
Northern District of California

1   "Three factors are relevant to this inquiry: (1) the amount and percentage of the shares sold; (2)

2   the timing of the sales; and (3) whether the sales were consistent with the insider's trading

3   history." *Metzler*, 540 F.3d at 1067.  According to Plaintiffs, Gelsinger sold $23.4 million worth

4   of VMware stock coinciding with alleged misleading statements.  Opp'n at 11; Am. Compl. ¶¶

5   168-171 (alleging that between September 4, 2019, and July 19, 2019, Gelsinger sold 141,181

6   VMware shares for a total of $23,417,156).  Plaintiffs believe that these sales were suspicious

7   because Gelsinger possessed non-public information and sold the shares during a period when

8   VMware stock prices were high.  Am. Compl. ¶¶ 168-169.  Gelsinger did not sell any stock in the

9   18 months prior to September 4, 2019, and these sales represented approximately 25% of his

10  VMware stock holdings.  *Id.* ¶ 171.  These facts suggest that these sales are suspicious in

11  comparison to Gelsinger's past trading practices.  *Police Ret. Sys. of St. Louis v. Intuitive Surgical*,

12  No. 10-CV-03451-LHK, 2012 WL 1868874, at *22 (N.D. Cal. May 22, 2012).

13          On reply, Defendants point to evidence submitted in the related Securities Class Action

14  suit of publicly filed Form 4 reports for Gelsinger, indicating that five of his six sales were made

15  pursuant to a Rule 10b5-1 plan.  Defs' Reply in Supp. of Mot. to Dismiss ("Reply"), Dkt. No. 61,

16  at 8.  The Form 4 filings show that at least some of Gelsinger's November 7, 2018, January 11,

17  2019, March 1, 2019, May 1, 2019, and June 19, 2019 sales were effected pursuant to 10b5-1

18  plans.  *Lamartina v. VMware, Inc.*, No. 5:20-cv-02182-EJD, Dkt No. 51-1, Exs. R-Z (N.D. Cal.

19  Nov. 17, 2020).  The Amended Complaint alleges at least one additional sale by Gelsinger on

20  September 4, 2018, but it is not clear whether that sale was conducted pursuant to a 10b5-1 plan.

21  *Compare id. with* Am. Compl. ¶ 169.  Moreover, it is unclear whether Gelsinger's 10b5-1 plan

22  was executed prior to his alleged knowledge or awareness of the manipulation of VMware's

23  reported backlog, and therefore the Court cannot conclude that the 10b5-1 plan negates any

24  scienter here.  17 C.F.R. § 240.10b5-1(c)(1)(i); *Azar v. Yelp, Inc.*, No. 18-CV-00400-EMC, 2018

25  WL 6182756, at *19 (N.D. Cal. Nov. 27, 2018); *see also Lamartina v. VMware, Inc.*, No. 5:20-cv-

26  02182-EJD, 2021 WL 4133851, at *12 (N.D. Cal. Sept. 10, 2021).

27          The Court finds that Plaintiffs have adequately pled particularized facts suggesting that

28  Case No.: 5:20-cv-03079-EJD
    ORDER GRANTING MOTION TO DISMISS

1    Gelsinger received a personal benefit from the backlog manipulation and subsequent

2    false/misleading statements that was not equally shared with the stockholders, and that he is

3    therefore interested in the claims against him.

4                          **b.      Michael Dell and Durban**

5          Michael Dell is the CEO, Chairman of the VMware Board of Directors, and majority

6    stockholder of Dell, which acquired VMware's parent company, EMC Corporation ("EMC"), in

7    September 2016.  Am. Compl. ¶¶ 18, 37, 184-186.  Michael Dell owns 91% of Dell's Class A

8    shares, representing 75.1% of the total vote of all outstanding shares in Dell.  *Id.* ¶ 184.  Durban is

9    a director of Dell, as well as a managing partner and co-CEO of Silver Lake Partners, a private

10   equity firm that—together with Michael Dell—orchestrated a leveraged buyout that returned Dell

11   to private company status.  *Id.* ¶¶ 23, 42, 199, 214.  Silver Lake owns 100% of Dell's Class B

12   shares, representing 19.9% of the total vote of all outstanding shares in Dell.  *Id.*  ¶¶ 184.  Through

13   their control of Dell, Plaintiffs allege, Michael Dell and Silver Lake also control VMware and its

14   board, because Dell controls approximately 80.9% of VMware's Class A stock and 100% of its

15   Class B stock, as well as the election of each of VMware's directors.  *Id.* ¶¶ 18, 37, 39-40, 184-

16   186.  Michael Dell and Silver Lake collectively control 97.4% of VMware's stock, which

17   Plaintiffs allege allows them to "exercise complete control over the composition of VMware's

18   Board, the composition of management, [VMware's] use of capital, and its strategic decisions."

19   *Id.* ¶ 185.

20         According to Plaintiffs, Dell has a high debt load of $54.5 billion as of July 31, 2020,

21   whereas VMware had only $4.75 billion in debt and over $60 billion in market capitalization at

22   that time.  *Id.* ¶ 197.  Plaintiffs allege that "Michael Dell and Silver Lake have . . . an interest in

23   VMware that diverges from VMware's minority shareholders: Michael Dell and Durban have

24   repeatedly used their control of VMware to bail out their investments in Dell, which are material

25   to them."  *Id.* ¶ 195.  For example, Plaintiffs say that in 2018, Michael Dell and Silver Lake

26   "orchestrated" an $11 billion special distribution from VMware to its stockholders, almost $9

27   billion of which went to Dell—and therefore to Michael Dell and Silver Lake.  *Id.* ¶ 198.

28   Case No.: 5:20-cv-03079-EJD
     ORDER GRANTING MOTION TO DISMISS
                                      15

VMware's 2020 Form 10-K report acknowledged Michael Dell and Durban's potential conflict of interest because of their connections with Dell:

> The Chairman of our Board of Directors, Michael Dell, is also Chairman and CEO of Dell and is a significant stockholder of Dell, and one of our directors, Egon Durb[a]n, is member of the Dell board of directors and managing partner of Silver Lake Partners, which is a significant stockholder of Dell. Another of our directors also holds shares of Dell common stock. Dell, through its controlling voting interest in our outstanding common stock, is entitled to elect 7 of our 8 directors and possesses sufficient voting control to elect the remaining director. Ownership of Dell common stock by our directors and the presence of executive officers or directors of Dell on our board of directors could create, or appear to create, conflicts of interest with respect to matters involving both us and Dell that could have different implications for Dell than they do for us.

*Id.* ¶ 42.

Plaintiffs say that in June 2020, the media reported that Michael Dell and Silver Lake were contemplating a spinoff of VMware in September 2021, which Plaintiffs believe to be an attempt to "bail out over-leveraged Dell." *Id.* ¶ 199. News reports suggested that such a spin-off could result in VMware paying Dell a large special dividend, which would assist Dell in paying down its heavy debts. *Id.* ¶¶ 199-201. Plaintiffs allege Michael Dell and Silver Lake (through Durban[6]) therefore had incentive to "maintain VMware's stock price by meeting guidance" and to maintain the cooperation of other VMware directors. *Id.* ¶ 203. As "the only portion of Dell that has any value to the market," devaluation of VMware stock would harm Dell, causing Michael Dell and Durban to lose out on their investments. *Id.* ¶¶ 210, 216. Plaintiffs argue these allegations create a reasonable doubt that Michael Dell and Durban would have responded in a disinterested way regarding a demand to investigate the alleged backlog manipulation. *Id.*

Defendants argue that Plaintiffs fail to allege facts indicating that either Michael Dell or Durban "has interests different from other VMware stockholders, including Plaintiffs themselves."

---

[6] Plaintiffs' conflation of Silver Lake and Durban without pleading facts explaining that their interests are entirely aligned and that their acts may be imputed to one another is somewhat concerning. However, Defendants do not appear to challenge the complaint on that basis.

Case No.: 5:20-cv-03079-EJD
ORDER GRANTING MOTION TO DISMISS

16

1   Mot. at 11.  Instead, Defendants contend that Dell and Silver Lake's ownership interest in

2   VMware supports the conclusion that their interests were aligned with VMware and other

3   stockholders.  *Id.*  But Plaintiffs have pled more than the simple fact that Michael Dell and Silver

4   Lake had an ownership stake in VMware through their control of Dell—they have pled

5   particularized facts suggesting that Michael Dell and Durban have an incentive to ensure that

6   VMware's stock is valued highly so that VMware can serve as a source of dividend payouts to

7   help alleviate Dell's debt through a spinoff, thus protecting Michael Dell and Durban's

8   investments in Dell.  Plaintiffs therefore allege that a corporate decision to investigate the alleged

9   backlog manipulation would have been a materially detrimental risk to Michael Dell and Durban

10  that VMware and its other stockholders would not have shared.

11          Finally, Plaintiffs offer one more reason as to why Michael Dell would be not be

12  disinterested: Michael Dell is personally subject to an injunction for Dell's prior violations of the

13  Securities Act of 1933 and the Exchange Act by failing to disclose material information to

14  investors and using fraudulent accounting practices to make it appear as though Dell was

15  consistently meeting earnings targets and to cover operating shortfalls.  Opp'n at 14–15; Am.

16  Compl. ¶¶ 65-67, 211-212, 214-216.  Consequently, Plaintiffs allege that Michael Dell would be

17  subject to higher penalties if found liable for violating securities laws again, and that Durban's

18  business collaborations and investments in Dell would be harmed if Michael Dell were to face

19  further SEC enforcement actions.  Am. Compl. ¶¶ 212, 216.  Defendants do not address this point

20  in their reply brief.  *See* Reply.  These allegations suggest that Michael Dell "cannot be expected

21  to exercise impartial judgment about whether it is in [VMware]'s best interests to sue the board as

22  the shareholders wish to do . . . ."  *La. Mun. Police*, 829 F.3d at 1055.

23          Accordingly, the Court finds that Plaintiffs have pled particularized facts indicating that

24  Michael Dell and Durban received a personal benefit from the alleged backlog manipulation and

25  subsequent false/misleading statements that was not equally shared with the stockholders, and that

26  and that they are therefore interested in the claims against them.

27

28  Case No.: 5:20-cv-03079-EJD
    ORDER GRANTING MOTION TO DISMISS

### c.    Remaining directors

With respect to the remaining directors, Plaintiffs do not argue that they received personal benefits from the alleged wrongful acts that other stockholders did not receive, as Plaintiffs did for Gelsinger, Michael Dell, and Durban.  Instead, Plaintiffs generally argue that they have adequately pled facts indicating a substantial likelihood of liability as to the remaining directors.  The only claims asserted against the remaining directors are breach of fiduciary duty against Michael Brown, Carty, Bates, Sagan, Marianne Brown, and Dykstra, and a derivative claim for violations of § 10(b) of the Exchange Act and SEC Rule 10b-5 against Gelsinger, Michael Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan.  The Court examines each claim in turn.

### i.    Breach of fiduciary duty

When the alleged shareholder losses arise from a decision made directly by the board, directors are liable if the "decision was ill advised or negligent."  *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch.1996).  However, when directors delegate corporate functions to officers or employees, directors instead have a duty of "oversight" governed by the *Caremark* standard, which requires the plaintiff establish that the directors acted without good faith "as evidenced by a sustained or systematic failure of a director to exercise reasonable oversight" of the activities leading to the corporate losses.  *Id.* at 971.  In pleading a *Caremark* claim to establish demand futility, a plaintiff must plead with particularity sufficient facts to show a substantial likelihood that half or more of the board was not acting in good faith, or at minimum was "conscious of the fact that they were not doing their jobs."  *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003).

Defendants assert—and Plaintiffs do not dispute—that Plaintiffs' breach of fiduciary duty claim is a *Caremark* oversight claim.  Mot. at 16; *see* Opp'n at 19.  Plaintiffs' third claim against Michael Brown, Carty, Bates, Sagan, Marianne Brown, and Dykstra appears to be based on the stock repurchase and allegedly false or misleading statements in public filings concerning VMware's backlog and financial status.  Am. Compl. ¶¶ 237-239, 266-271 (alleging breach of fiduciary duties by "willfully participat[ing] in and caus[ing] the Company to expend

1    unnecessarily its corporate funds" and "knowingly or recklessly ma[king] untrue statements and/or

2    permitt[ing] the Company's public filings, disclosure, and statements to misleadingly represent the

3    demand for VMware's products").  The issue before the Court thus appears to be whether

4    Plaintiffs have adequately pled particularized facts from which the Court may infer that the

5    directors at issue consciously failed to monitor or oversee VMware's backlog practices.  If the

6    directors had knowledge and made a conscious decision not to act, then they may have violated

7    their duty of loyalty and face a substantial likelihood of liability, thus excusing demand as futile.

8    *In re Intuitive Surgical S'holder Deriv. Litig.*, 146 F. Supp. 3d 1106, 1116 (N.D. Cal. 2015).

9         "A plaintiff who cannot point to facts supporting such a decision can plead that the board

10   consciously failed to act after learning about evidence of illegality—the proverbial 'red flag.'"

11   *South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012).  Plaintiffs argue that they have pled "numerous red

12   flags" demonstrating that Defendants were aware of the improper backlog practices.  Opp'n at 19–

13   20.  First, Plaintiffs assert that Michael Brown, Carty, and Sagan were directors or officers of

14   VMware or its parent company in 2010, when the SEC commented on VMware's increase in

15   deferred revenue and sought clarification on VMware's invoicing and backlog reporting practices.

16   Am. Compl. ¶¶ 77-78.  But Plaintiffs plead elsewhere in the complaint that Carty was not an EMC

17   board member in 2010, *id.* ¶ 190, and there are no facts alleged describing why an EMC director

18   would or should be aware of SEC communications with an EMC subsidiary.  At any rate, such

19   inquiries from the SEC merely seeking clarification are not sufficient to suggest that VMware was

20   actually engaging in any improper backlog practices, much less to put a reader on notice of what

21   such improper practices consisted of.

22        Second, Plaintiffs assert that Carty, as an officer and director of Dell (along with Michael

23   Dell and Durban), was aware of the manner in which backlog could be manipulated to meet

24   revenue targets, because Dell's Form 10-K filings for the past decade acknowledge such a

25   possibility.  Opp'n at 20; Am. Compl. ¶ 57.  While this allegation may suggest that Carty knew of

26   backlog manipulation methods, it does not necessarily indicate that Carty knew that such

27   manipulation was occurring at VMware at the time.

28   Case No.: 5:20-cv-03079-EJD
     ORDER GRANTING MOTION TO DISMISS
                              19

United States District Court
Northern District of California

1

Third, Plaintiffs appear to suggest other red flags in the form of Gelsinger's and Rowe's

stock sales and Michael Dell's planned spin-off for VMware.  But there are no facts pled in the

complaint indicating that Michael Brown, Carty, Bates, Sagan, Marianne Brown, or Dykstra were

aware of or involved in such events or plans.  And to the extent Plaintiffs contend that the stock

buyback or the "rapid build-up and draw down of the backlog and the effect thereof on the

Company's reported financial condition [as] reported in documents [the directors] signed" are

themselves red flags, Opp'n at 20, those are the very harms that Plaintiffs allege resulted from the

directors' inaction in the first place.  This circular logic does not make sense.

Finally, to the extent Plaintiffs rely on Michael Brown, Carty, Dykstra, and Sagan's service

as members of the VMware Audit Committee and Bates, Michael Brown, and Sagan's service on

the Compensation and Corporate Governance Committee as reasons these directors were aware of

backlog manipulation activities at VMware, those conclusory allegations are not sufficient.  ("As

numerous Delaware decisions make clear, an allegation that the underlying cause of a corporate

trauma falls within the delegated authority of a board committee does not support an inference that

the directors on that committee knew of and consciously disregarded the problem for purposes of

Rule 23.1."  *South*, 62 A.3d at 17.

Ultimately, the complaint contains only general assertions of knowledge and inaction:

> The Individual Defendants are sophisticated, experienced business
> people that were well aware of the risks posed to VMware and its
> stockholders by improper earnings management, and other
> disclosure violations.  The Individual Defendants were required to
> investigate and take action to remediate such improper conduct, but
> failed to do so.  Had the Individual Defendants taken timely action,
> the damage incurred by VMware and its stockholders could have
> been prevented, or at least minimized.  Rather than take timely
> action, however, the Individual Defendants allowed the misconduct
> to go on, enriching the officers responsible with excessive
> compensation, to the detriment of VMware and its stockholders.

Am. Compl. ¶ 79.  Accordingly, the Court finds that Plaintiffs have not pled particularized facts

demonstrating a substantial likelihood of liability for Michael Brown, Carty, Bates, Sagan,

Marianne Brown, and Dykstra on the breach of fiduciary duty claim.

Case No.: 5:20-cv-03079-EJD
ORDER GRANTING MOTION TO DISMISS
20

### ii.       Section 10(b) and Rule 10b-5

Finally, Plaintiffs allege a derivative claim Gelsinger, Michael Dell, Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan for violation of § 10(b) of the Exchange Act and Rule 10b-5 when they disseminated materially false and misleading statements in VMware's SEC filings and press releases and during VMware's earnings calls.  *See* Am. Compl. ¶¶ 44-45. Section 10(b) provides that "[i]t shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations . . . ."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements this provision by making it unlawful for any person

> (a) [t]o employ any device, scheme, or artifice to defraud,
> (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5(b).  To state a claim under § 10(b) and Rule 10b-5, Plaintiffs must allege facts sufficient to establish: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation marks omitted).

As an initial matter, Defendants seek to incorporate by reference arguments made in the Securities Class Action.  Mot. at 19 n.7.  As Plaintiffs point out, such incorporation of arguments from briefs in another action is improper, and the Court declines Defendants' invitation to permit them to circumvent the page limits laid out in the Civil Local Rules.  *Williams v. Cty. of Alameda*, 26 F. Supp. 3d 925, 947 (N.D. Cal. 2014) (declining to consider arguments that litigant improperly sought to incorporate by reference).  Although the Court will not consider the arguments made in the Securities Class Action, it will consider the arguments contained in Defendants' moving papers, however briefly offered.

Case No.: 5:20-cv-03079-EJD
ORDER GRANTING MOTION TO DISMISS

21

1    First, Defendants contend that the allegedly false/misleading statements are not actionable

2    because they are (a) accurate statements of fact, (b) forward-looking statements protected under

3    the PSLRA safe harbor, or (c) expressions of corporate optimism or puffery.  Mot. at 19.  As to the

4    factual accuracy of the reported backlog, Plaintiffs have alleged in general terms that Defendants

5    manipulated VMware's backlog by withholding, deliberately delaying, or deferring recognition of

6    revenue and earnings once the current period's targets were met, thereby reporting backlog

7    amounts that were technically accurate but purposely inflated.  Am. Compl. ¶¶ 46, 56-57.

8    However, Plaintiffs allege only that "*VMware* manipulated its reported backlog," and do not

9    explain exactly who—if anyone—among the Defendants made the decision to delay or defer

10    recognition of revenue or to report the manipulated backlog amounts in public disclosures.  *Id.*

11    (emphasis added).  Nor does Plaintiffs' opposition brief point to any particularized allegations in

12    the complaint.  *See* Opp'n at 23.  As to the PSLRA safe harbor for forward-looking statements or

13    statements of corporate optimism or puffery, Defendants do not identify any specific statements,

14    and Plaintiffs do not even address these arguments.  *See* Mot. at 19; Opp'n at 23; Reply at 9.  The

15    Court will not comb through the complaint for statements the parties have not bothered to identify.

16    Second, Defendants argue that Plaintiffs have not pled a strong inference of scienter.  Mot.

17    at 19.  In particular, Defendants assert that Plaintiffs "allege no facts indicating that Defendants

18    were aware of facts contradicting their public statements, much less that they acted with intent to

19    defraud" VMware.  *Id.*  Plaintiffs respond that they have pled scienter through unusual and

20    suspicious stock sales, as well as Michael Dell and Durban's plan to bail out Dell through a spin-

21    off of VMware.  Opp'n at 23.  As to the unusual and suspicious stock stales, the complaint only

22    describes such sales on the part of Gelsinger and Rowe.  Am. Compl. ¶¶ 168-176.  Plaintiffs do

23    not explain how Gelsinger's sales equate to scienter on the part of Michael Dell, Bates, Michael

24    Brown, Carty, Durban, Dykstra, and Sagan.  As to the spin-off plan, the Court has found that

25    Plaintiffs have adequately pled facts suggesting interestedness on the part of Michael Dell and

26    Durban.  While those facts may suggest scienter for Michael Dell and Durban, Plaintiffs do not

27    explain how the spin-off plan is suggestive of scienter for Bates, Michael Brown, Carty, Dykstra,

28    Case No.: 5:20-cv-03079-EJD
ORDER GRANTING MOTION TO DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1   and Sagan.  To the extent Plaintiffs rely on an argument that those directors are not independent of

2   Michael Dell and Durban, that argument is not supported by factual allegations in the complaint,

3   as described further below.  *See infra* Section III.A.2.

4           Third, Defendants assert that Plaintiffs have not pled any causal relationship between the

5   alleged misstatements and decline in VMware stock.  Mot. at 20.  "To prove loss causation,

6   plaintiffs need only show a 'causal connection' between the fraud and the loss by tracing the loss

7   back to the very facts about which the defendant lied."  *Mineworkers' Pension Scheme v. First*

8   *Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (internal quotation marks and citations omitted).  "A

9   plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's

10  decline in value," but it must set forth facts that "if assumed true, are sufficient to provide [the

11  defendant] with some indication that the drop in [defendant's] stock price was causally related to

12  [the defendant's] financial misstatement[s]."  *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006,

13  1025–26 (9th Cir. 2005) (internal quotation marks omitted, emphasis original).  Plaintiffs point to

14  the disclosure of the SEC investigation as causing a stock price drop because it alerted the market

15  that VMware's rapid backlog buildup and draw down was the result of revenue manipulation.

16  Opp'n at 24; Am. Compl. ¶¶ 3-4, 160-167.  However, the Ninth Circuit has held:

17              The announcement of an investigation does not "reveal" fraudulent
                practices to the market.  Indeed, at the moment an investigation is
18              announced, the market cannot possibly know what the investigation
                will ultimately reveal.  While the disclosure of an investigation is
19              certainly an ominous event, it simply puts investors on notice of a
                potential future disclosure of fraudulent conduct.  Consequently, any
20              decline in a corporation's share price following the announcement of
                an investigation can only be attributed to market speculation about
21              whether fraud has occurred.  This type of speculation cannot form
                the basis of a viable loss causation theory.  Accordingly, we hold
22              that the announcement of an investigation, without more, is
                insufficient to establish loss causation.
23

24  *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014).  Thus, as a matter of law, VMware's

25  February 27, 2020 Form 8-K describing an ongoing SEC investigation could not have revealed the

26  fraudulent backlog practice to the market, and the subsequent drop in VMware stock price on

27  February 28, 2020 is attributable to speculation that cannot support a loss causation theory.  In

28  Case No.: 5:20-cv-03079-EJD
    ORDER GRANTING MOTION TO DISMISS

1    their opposition brief, Plaintiffs do not point to any other facts in the complaint that, when

2    combined with the announcement of the SEC investigation, would adequately allege loss

3    causation.

4         Accordingly, the Court finds that Plaintiffs have not plead a substantial likelihood of

5    liability for Bates, Michael Brown, Carty, Durban, Dykstra, and Sagan on the § 10(b) and Rule

6    10b-5 derivative claim.

7                        **2.    Independence**

8         The Court now considers whether Plaintiffs' allegations reflect a reasonable doubt that

9    other VMware directors lacked independence because they were beholden to Michael Dell and/or

10   Durban.

11        In the context of a pre-suit demand, directors are entitled to a presumption that they

12   fulfilled their fiduciary duties, and "the burden is upon the plaintiff in the derivative action to

13   overcome that presumption" with particularized factual allegations.  *Beam ex rel. Martha Stewart*

14   *Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048–49 (Del. 2004); *see also Weiss v.*

15   *Swanson*, 948 A.2d 433, 441 (Del. Ch. 2008) (the requirement of particularized facts means that a

16   plaintiff's pleading burden in the demand futility context is "more onerous" than that required to

17   withstand a Rule 12(b)(6) challenge).  "At the pleading stage, a lack of independence turns on

18   whether the plaintiffs have pled facts from which the director's ability to act impartially on a

19   matter important to the interested party can be doubted because that director may feel either

20   subject to the interested party's dominion or beholden to that interested party."  *Sandys v. Pincus*,

21   152 A.3d 124, 128 (Del. 2016) (internal quotation marks omitted).  A director is "beholden" to an

22   interested party when they are "so under [an interested party's] influence that [the director's]

23   discretion [is] sterilized."  *Rales*, 634 A.2d at 936; *see also McElrath v. Kalanick*, 224 A.3d 982,

24   991 (Del. 2020) ("Independence turns on whether [a director is] subject to the interested party's

25   dominion or beholden to that interested party.") (internal quotation marks and citations omitted).

26   "Independence is a fact-specific determination made in the context of a particular case."  *Beam*,

27   845 A.2d at 1049.

28   Case No.: 5:20-cv-03079-EJD
     ORDER GRANTING MOTION TO DISMISS
                        24

United States District Court
Northern District of California

1        Here, Plaintiffs argue that individual VMware directors—in particular, Carty, Bates,

2   Michael Brown, Sagan, and Marianne Brown—were beholden to Michael Dell and/or Durban.

3   Opp'n at 17.  The Court considers each director in turn.

### i.       Carty

5        Plaintiffs allege that Carty lacks independence because Carty has "worked for Michael

6   Dell for nearly 30 years" as an executive and director of Dell and its predecessor organizations,

7   and that Carty has earned nearly $10 million in compensation due to Michael Dell's decisions and

8   ability through his control of Dell to appoint Carty to Dell's board of directors and to hire Carty as

9   an executive.  Am. Compl. ¶¶ 41, 189, 218.  Carty served as a director at EMC from January 2015

10  to September 2016 prior to its merger with Dell, for which he was further compensated $456,000.

11  *Id.* ¶ 190.  Plaintiffs further allege that Carty received greater compensation for his service as

12  director than most other directors at similarly sized companies—specifically, $995,000 in director

13  fees in the last three years alone.  *Id.* ¶¶ 194, 218.

14       With respect to Carty's 30-year history of employment at Dell and other related

15  organizations, this bare allegation as currently pled is not sufficient to plead a lack of

16  independence.  *See, e.g.*, *La. Mun. Police Emps' Retirement Sys. v. Wynn*, 829 F.3d 829 F.3d

17  1048, 1060 (9th Cir. 2016) (allegations that director worked at interested party-controlled

18  enterprises for many years and received substantial monetary compensation for doing so were not

19  sufficient to plead lack of independence); *McElrath on behalf of Uber Techs., Inc. v. Kalanick*,

20  No. 2017-0888-SG, 2019 WL 1430210, at *18 (Del. Ch. Apr. 1, 2019) (allegations of "a long-

21  term employee relationship," conclusory assertions that interested party and director are "close,"

22  and allegations that director was described as interested party's "confidant" and "ally" were

23  collectively insufficient to find lack of independence); *Hamilton v. Barnes*, 806 F. App'x 536, 538

24  (9th Cir. 2020) ("[I]t is not sufficient merely to allege various relationships or memberships of the

25  Defendants—such as membership on [committees of the nominal defendant company],

26  employment at [the company], or directorships at [a company] subsidiary or joint venture—

27  without providing an explanation as to *why* such relationships or memberships create a reasonable

28  Case No.: 5:20-cv-03079-EJD
ORDER GRANTING MOTION TO DISMISS
25

*United States District Court*
*Northern District of California*

doubt of independence for the purposes of demand futility.") (emphasis original).  While the allegations in *Louisiana Municipal* and *McElrath* concerned employment relationships spanning approximately 10 years, and Carty has worked at Dell organizations for nearly triple that amount of time, Plaintiffs do not explain how the longevity of such a relationship demonstrates a lack of independence, nor do they cite to any case law supporting that proposition.  *See, e.g.*, *Sciabacucci v. Liberty Broadband Corp.*, No. 11418-VCG, 2018 WL 3599997, at *11 (Del. Ch. July 26, 2018) ("'[S]ubstantial past or current relationships . . . of a business . . . nature' may, if material to the director, give rise to a pleading-stage inference of beholdenness.") (quoting *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 261 n.45 (Del. Ch. 2006)).  The fact that Michael Dell chose Carty as a director is also not enough, as "the law is well-settled that [an interested party]'s involvement in selecting each of the directors is insufficient to create a reasonable doubt about their independence."  *White v. Panic*, 793 A.2d 356, 366 (Del. Ch. 2000) (citing *Aronson*, 473 A.2d at 816).

With respect to Carty's compensation, "a plaintiff seeking to show that a director was not independent must meet a materiality standard, under which the court must conclude that the director in question's material ties to the person whose proposal or actions she is evaluating are sufficiently substantial that she cannot objectively fulfill her fiduciary duties."  *La. Mun. Police*, 829 F.3d at 1059 (quoting *In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013) (internal quotation marks omitted).  The court must consider materiality in the director's personal context— i.e., whether "a specific director's independence is compromised by factors material to her."  *Id.* (internal quotation marks omitted).  Where compensation is concerned, "it is necessary to look to the financial circumstances of the director in question to determine materiality."  *Id.* (quoting *In re MFW*, 67 A.3d at 510) (internal quotation marks omitted).  Here, Plaintiffs only conclusorily allege that the compensation Carty earned as director and executive at Dell and Dell-related organizations or as VMware director were material to him.  Am. Compl. ¶ 218.  The complaint contains no factual allegations to support that conclusion.

Accordingly, the Court finds that Plaintiffs have not adequately pled that Carty lacks

United States District Court
Northern District of California

1    independence.

2                              ii.       **Bates**

3            Plaintiffs allege that Bates lacks independence from Durban owing to their "a long-

4    standing lucrative business relationship." Am. Compl. ¶ 192. In 2009, Silver Lake acquired a

5    majority stake in Skype Global S.a.r.l. ("Skype"). Plaintiffs assert that "[u]nder Durban's

6    control," Skype hired Bates as CEO. *Id.* ¶¶ 192, 219. Plaintiffs allege that Bates's tenure as

7    Skype's CEO lasted less than a year, but he nevertheless earned approximately $19 million in

8    compensation. *Id.* Additionally, Plaintiffs allege that Durban and Bates sat on the board of

9    directors of a charity from 2012 to 2020, to which Durban and Bates donated over $1.35 million

10   and $600,000, respectively. *Id.* ¶¶ 191, 219. Finally, Plaintiffs say that Bates received greater

11   compensation for his service as a VMware director than most other directors at similarly sized

12   companies—specifically, over $1.13 million in director fees in the last three years alone. *Id.* ¶¶

13   194, 219. Plaintiffs contend that these facts indicate Bates's lack of independence from Durban

14   because they show that Bates "will not take action contrary to Silver Lake's financial and

15   reputational interests." *Id.* ¶ 219.

16           At first glance, $19 million in compensation for less than a year's work as CEO seems

17   curious, but there are no allegations in the complaint demonstrating that such an amount was an

18   unusual practice for Skype or other similar companies or otherwise providing context for that

19   figure. Moreover, Bates's time as Skype CEO occurred well over a decade ago, and the complaint

20   similarly lacks facts suggesting that that brief period of employment would be material to Bates in

21   considering VMware shareholders' demand today.

22           As for Bates and Durban's service together on the board of directors of a charity to which

23   they have both donated, Plaintiffs do not explain why that service would indicate a lack of

24   independence. *Zimmerman ex rel. Priceline.com, Inc. v. Braddock*, No. Civ. A. 18473-NC, 2002

25   WL 31926608, at *10 (Del. Ch. Dec. 20, 2002) ("[A]llegations as to one's position on multiple

26   boards does not in and of itself call into question one's independence from an interested director

27   sitting with him on such boards."); *see also In re CBS Corp. S'holder Class Action and Deriv.*

28   Case No.: 5:20-cv-03079-EJD
     ORDER GRANTING MOTION TO DISMISS

United States District Court
Northern District of California

1    *Litig.*, No. 2020-0111-JRS, 2021 WL 268779, at *30 and n.352 (Del. Ch. Jan. 27, 2021)

2    (allegations that director was a "close friend" of interested party and served on a non-profit board

3    with her were insufficient, standing alone, to raise a reasonable doubt about the director's fitness

4    to consider a demand); *Hamilton*, 806 F. App'x at 538 ("[I]t is not sufficient merely to allege

5    various relationships or memberships of the Defendants . . . without providing an explanation as

6    to *why* such relationships or memberships create a reasonable doubt of independence for the

7    purposes of demand futility.") (emphasis original).  Finally, Plaintiffs do not plead facts

8    demonstrating that Bates's compensation as VMware director was material to him.  *La. Mun.*

9    *Police*, 829 F.3d at 1059 (quoting *In re MFW*, 67 A.3d at 510).

10         Accordingly, the Court finds that Plaintiffs have not adequately pled that Bates lacks

11   independence.

12                              **iii.    Marianne Brown**

13         Plaintiffs allege that Marianne Brown is not independent of Durban.  From February 2014

14   to December 2015, Marianne Brown served as director and Chief Operating Officer of Sungard, a

15   software company that Silver Lake acquired in 2005 which later became Sungard Financial

16   Systems.  Am. Compl. ¶¶ 193, 222.  Although Plaintiffs acknowledge that they do not know how

17   much she was compensated for those roles at Sungard, they assert that the compensation for this

18   position was significant and material to her as her primary source of employment.  *Id*.  Plaintiffs

19   also say that Marianne Brown receives reputational and professional benefits for serving on

20   VMware's board, as well as greater compensation for her service as a VMware director than most

21   other directors at similarly sized companies.  *Id.* ¶¶ 194, 222.  Therefore, Plaintiffs allege,

22   Marianne Brown "will not take any action opposed by Michael Dell or Durban for fear of

23   jeopardizing her position on VMware's Board."  *Id*. ¶ 222.

24         Standing alone, the allegations concerning Marianne Brown's previous employment at

25   Sungard, which lasted less than two years, are not sufficient to show that she lacks independence.

26   *La. Mun. Police*, 829 F.3d 829 F.3d at 1060; *Sciabacucci*, 2018 WL 3599997, at *11.  While

27   Marianne Brown may receive reputational and professional benefits as a VMware director, the

28   Case No.: 5:20-cv-03079-EJD
     ORDER GRANTING MOTION TO DISMISS
                                         28

same may be said for any director of a large company, and Plaintiffs cite to no case law holding that such benefits would dissuade a director from properly considering a demand.  Finally, Plaintiffs' allegations concerning Marianne Brown's compensation as director are contradictory. They allege that the median director compensation at similarly sized companies is $285,000, but then go on to allege that she received over $210,000 in 2019.  Am. Compl. ¶¶ 194, 222.  This amount is decidedly below the median compensation, and thus does not create the inference of a lack of independence.  At any rate, Plaintiffs do not plead facts demonstrating that Marianne Brown's compensation as VMware director was material to her.  *La. Mun. Police*, 829 F.3d at 1059 (quoting *In re MFW*, 67 A.3d at 510).

Accordingly, the Court finds that Plaintiffs have not adequately pled that Marianne Brown lacks independence.

### iv.      Michael Brown and Sagan

Plaintiffs allege that Michael Brown and Sagan are not independent of Michael Dell and Durban because they previously served as directors at EMC for seven years prior to its merger with Dell, during which time Michael Brown and Sagan earned $2.7 million and $2.2 million, respectively.  Am. Compl. ¶ 221.  Plaintiffs also allege that they are not independent of Gelsinger because they worked with him as EMC's President.  *Id.*  Additionally, Plaintiffs contend that Michael Brown and Sagan received greater compensation for their service as VMware directors than most other directors at similarly sized companies—specifically, Sagan earned over $1.77 million and Michael Brown earned over $1.35 million in director fees in the last three years alone. *Id.* ¶¶ 194, 221.

Plaintiffs do not explain how Michael Brown's and Sagan's employment as EMC directors *before* the acquisition by Dell demonstrates that they are beholden to Michael Dell or Durban, or how a previous working relationship with Gelsinger demonstrates that they are beholden to him. "'[M]ere allegations that directors are friendly with, travel in the same social circles, or have past business relationships with the proponent of a transaction or the person they are investigating, are not enough to rebut the presumption of independence.'"  *La. Mun. Police*, 829 F.3d at 1061 n.5

United States District Court
Northern District of California

United States District Court
Northern District of California

(quoting *In re MFW*, 67 A.3d at 509); *see also Hamilton*, 806 F. App'x at 538 ("[I]t is not sufficient merely to allege various relationships or memberships of the Defendants . . . without providing an explanation as to *why* such relationships or memberships create a reasonable doubt of independence for the purposes of demand futility.") (emphasis original).  As for their compensation, Plaintiffs conclusorily allege that the compensation Michael Brown and Sagan earned as VMware directors was material to them.  Am. Compl. ¶ 221.  The complaint contains no factual allegations to support that conclusion.

Accordingly, the Court finds that Plaintiffs have not adequately pled that Michael Brown and Sagan lack independence.

### v.  Dykstra

Plaintiffs do not argue in their opposition brief that Dykstra lacked independence, but they nevertheless plead that she is not independent in the complaint.  *Compare* Opp'n at 17–19 *with* Am. Compl. ¶ 223.  The only allegations concerning Dykstra's independence state that she received greater compensation for her service as a VMware director than most other directors at similarly sized companies—specifically, over $1.17 million in director fees in the last three years alone.  Am. Compl. ¶¶ 194, 223.  As with all other similar allegations concerning other directors, Plaintiffs only conclusorily allege that the compensation Dykstra earned as a VMware director was material to her.  *Id.*  The complaint contains no factual allegations to support that conclusion.

Accordingly, the Court finds that Plaintiffs have not adequately pled that Dykstra lacks independence.

### 3.  Summary

In sum, the Court finds that although Plaintiffs have adequately alleged that Gelsinger, Michael Dell, and Durban are interested, they have not adequately pled facts from which it may be inferred that at least two other directors were also interested or not independent of Gelsinger, Michael Dell, or Durban.  Nor have Plaintiffs alleged sufficient particularized facts from which it may be inferred that the remaining directors possess a substantial likelihood of liability on the claims against them.  Plaintiffs have thus not adequately pled demand futility.  Because Plaintiffs

Case No.: 5:20-cv-03079-EJD
ORDER GRANTING MOTION TO DISMISS

may be able to allege additional facts that could show that demand would be futile, the Court grants leave to amend.

### B.    Failure to State a Claim

Defendants further move to dismiss based a failure to state a claim under Rule 12(b)(6). Mot. at 22–23.  However, because the Court finds that Plaintiffs have failed to plead demand futility, it need not reach a 12(b)(6) analysis at this time.

## IV.    CONCLUSION

For the reasons given above, the Court GRANTS Defendants' motion to dismiss with leave to amend the deficiencies outlined above.  Plaintiffs shall file an amended complaint by **October 14, 2021**.

**IT IS SO ORDERED.**

Dated: September 30, 2021

EDWARD J. DAVILA
United States District Judge